UNIVERSAL DRILLING COMPANY, a Colorado corporation, Plaintiff-Appellant, Cross Appellee,

Jack Grynberg and Associates; Celeste Grynberg; and Jack J. Grynberg, Plaintiffs-Appellants,

v.

CAMAY DRILLING COMPANY, a California corporation, Defendant-Appellee, Cross Appellant.

Nos. 81–2375, 81–2465.

United States Court of Appeals, Tenth Circuit.

June 21, 1984.

Rodney R. Patula of Pryor, Carney & Johnson, P.C., Englewood, Colo. (Christopher N. Mammel of Pryor, Carney & Johnson, Englewood, Colo., Ernest W. Lohf of Lohf & Barnhill, P.C., Denver, Colo., William D. Scheid and Jeffrey L. Beattie of Law & Scheid, P.C., Denver, Colo., with him on the briefs), for plaintiff-appellants, cross appellee.

John S. Pfeiffer, Denver, Colo. (Anne E. DeVine and Simon J. Freedman, Denver, Colo., with him on the brief) of Gorsuch, Kirgis, Campbell, Walker & Grover, Denver, Colo., for defendant-appellee, cross appellant.

Before McWILLIAMS, BARRETT and McKAY, Circuit Judges.

McKAY, Circuit Judge.

The parties to this lawsuit are "experienced, sophisticated, intelligent business[men] with vast education and experience in petroleum engineering, ... oil and gas exploration, and ... [the] makeup and operation of oil drilling rigs and equipment." Record, vol. 5, at 2. In June 1977 they entered into negotiations for the purchase and sale of two drilling rigs referred

to by the parties as the Marthens Rig and Rig 10.

The negotiations resulted in a contract dated July 1, 1977, and an amendment to that contract dated August 8, 1977.* Despite the dates written on the documents, plaintiffs contend that there was no contract until the amendment was actually executed on August 19, 1977. Defendant does not challenge that contention.

The contract defines the property to be sold as the personal property listed in Exhibits A, B and C to the contract. Rig 10 is defined as the property in Exhibit A and the Marthens Rig is defined as the property in Exhibits B and C. Record, supp. vol. 2, Plaintiffs' Exhibit No. 1 at 1.

Subsequent to the delivery of the property, plaintiffs complained that the property they received did not conform to the contract alleging that they were to receive two used but nevertheless operable drilling rigs. Defendant, however, relying on the contract, argued that it delivered all of the property listed in the specific exhibits. This diversity lawsuit resulted.

At trial plaintiffs sought to introduce extrinsic evidence to establish certain representations and warranties made by defendant. The trial court applying the parol evidence rule embodied in Colo.Rev.Stat. § 4-2-202 (1973), excluded the evidence despite plaintiffs' claims that the evidence was admissible under the fraud exception to the parol evidence rule. The trial court also rejected plaintiffs' theory that there were breaches of express warranties based on the description of the goods contained in the contract. Plaintiffs appeal those rulings as well as the court's award of attorneys' fees.

## Parol Evidence

■ When a contract has been reduced to writing and it is intended to be a final expression of the agreement between the parties, its terms cannot be altered or contradicted by evidence of prior oral agreements. Colo.Rev.Stat. § 4-2-202 (1973). The judge is to determine as a matter of law whether a writing was intended to be the final expression of an agreement. *See Union Rural Electric Association v. Public Utilities Commission,* 661 P.2d 247, 251 n. 5 (Colo.1983).

■ A well recognized exception to the parol evidence rule is when a party to the contract can show fraud in the inducement of the contract. J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code* § 2-11 at 88 (2d ed. 1980); *see O'Neil v. International Harvester Co.,* 40 Colo.App. 369, 575 P.2d 862 (1978). To prevent the fraud exception from swallowing up the parol evidence rule when a party merely alleges fraud, Professors White and Summers recommend that a judge "hold a preliminary hearing away from the jury to determine whether the party offering the evidence is really seeking to show fraudulent misrepresentation or fraudulent nondisclosure." J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code* § 2-11 at 88 (2d ed. 1980). That procedure was followed by the trial court in this case.

Plaintiffs made a lengthy offer of proof concerning the representations they allege

---

* The July 1, 1977 contract contained the following clauses:

18.01 The assets being purchased and sold hereunder are being sold by [defendant] in an "as-is" condition and without any warranty of operability or fitness.

\* \* \* \* \* \*

26.01 This Agreement and the exhibits hereto and the agreements referred to herein set forth the entire agreement and understanding of the parties in respect of the transactions contemplated hereby and supersede all prior agreements, arrangements and understandings relating to the subject matter hereof. No representation, promise, inducement or statement of intention has been made by [defendant] or [plaintiffs] which is not embodied in this Agreement or in the documents referred to herein, and neither [defendant] nor [plaintiffs] shall be bound by or liable for any alleged representation, promise, inducement or statements of intention not so set forth.

Record, supp. vol. 2, Plaintiffs' Exhibit No. 1 at 9, 12. The amendment of August 8th contained a similar provision. *Id.* Plaintiffs' Exhibit No. 2 at 5 & 6.

occurred which amounted to fraud. Most of the alleged misrepresentations concerned the location, condition and use of the Marthens Rig. The trial court found plaintiffs' offer of proof insufficient to submit the question of fraud in the inducement to the jury. The extrinsic evidence was accordingly excluded. On appeal plaintiffs contend that they established a prima facie case of fraud and that the trial court's refusal to admit the evidence amounted to a directed verdict against plaintiffs on their claim of fraud.

The elements of a prima facie case of fraud in Colorado are enumerated in *Morrison v. Goodspeed*, 100 Colo. 470, 68 P.2d 458 (1937). They are:

(1) A false representation of a material existing fact, or a representation as to a material existing fact made with a reckless disregard of its truth or falsity; or a concealment of a material existing fact, that in equity and good conscience should be disclosed. (2) Knowledge on the part of the one making the representation that it is false; or utter indifference to its truth or falsity; or knowledge that he is concealing a material fact that in equity and good conscience he should disclose. (3) Ignorance on the part of the one to whom representations are made or from whom such fact is concealed, of the falsity of the representation or of the existence of the fact concealed. (4) The representation or concealment made or practiced with the intention that it shall be acted upon. (5) Action on the representation or concealment resulting in damage.

*Id.* 68 P.2d at 462 (citation omitted).

Without discussing whether plaintiffs made a proper showing on each and every one of the five elements, we can say that the trial court did not err in excluding the parol evidence. The element of reliance on the representation is dispositive.

■ Plaintiffs claim there was no contract until August 19, 1977. Plaintiffs also do not challenge the written provisions of the contract including the integration and exclusion of warranty clauses. In fact,

plaintiffs' attorney aided in the preparation of the document. Record, vol. 1, at 130. Accordingly, to the extent that plaintiffs had knowledge of the conditions of the rigs and their inoperability prior to August 19th, they cannot claim that they relied on any oral representations, if any were made.

On July 13, 1977 plaintiffs sent a telex to defendant which in part read:

It was my understanding both rigs have been working and, in fact, were ready to continue contract work upon delivery to Universal Drilling Company. I was not made aware that your Rig 10 in California will have only 10,000 feet of drill pipe and no drill collars. I was informed that your rig coming from Dubai was short two engines and generators and a simple switch panel. I indicated to you that I have no objection to spending $300,000 putting it in working condition. Subsequently, Glenn Cooksey agreed to pay the $125,000 in July of 1978 and you agreed to include the two motors and generators that Raymond International unlawfully removed from your premises. I understood that this was in addition to the existing two motors and generators. At all times it was represented that the rig on the ship was a platform rig and, accordingly, we spent the last three weeks making arrangements to put that rig to work on a platform. We learned, on Monday, July 11, that the rig on the ship was never a platform rig but was taken off a jack-up and was unfit for platform workm [sic] We were also informed that in order for that rig to be fit for platform work, we would have to spend $3½ million and if we were to put the rig to work on land our expenditures could be as high as $1½ million depending on the condition of the various parts when they arrived, including, of course, the additional electrical panel switch which we found out several days ago does not have a simple switch panel missing but a complete electrical control system.

Record, supp. vol. 2, Court Exhibit No. 1.

In response, defendant sent a return telex the same day in which defendant said:

We have received your telex of 7/13/77 and we are in complete disagreement as to any alleged representations on our part not contained in the Agreement of July 1, 1977.

The assets being sold are described in Exhibits A, B, & C, and covered by Section 18.01 of the Agreement. Furthermore, per section 26.01 there are no representations other than set forth in the Agreement and modified by our letter of July 12, 1977.

*Id.* Court Exhibit No. 2.

As a matter of law we can say that plaintiffs did not reasonably rely on any representations extrinsic to the contract made prior to the exchange of telexes on July 13. As of that date plaintiff knew that no extrinsic representations were to be relied upon but nevertheless executed the amendment to the contract on August 19 without any modification of the representations contained in the contract.

The trial court correctly excluded the extrinsic evidence.

### Breach of Express Warranties by Description

Approaching this issue it must again be remembered that the parties to this suit are experienced in the field of oil and gas exploration and drilling. Furthermore, none of the parties allege that they were in an inferior bargaining position.

Plaintiffs do not dispute the trial court's finding that the contract, specifically paragraph 18.01, effectively disclaimed all implied warranties. Plaintiffs do allege, however, that the description of the assets contained in the contract created an express warranty that the assets would conform to that description. In addition, plaintiffs argue that such an express warranty of description cannot be disclaimed, Brief of Appellants at 32, or at least was not effectively disclaimed.

Section 2–316 of the Uniform Commercial Code as adopted in Colorado provides for the modification and exclusion of warranties. Colo.Rev.Stat. § 4–2–316 (1973). In particular it provides that

[w]ords or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this article on parol or extrinsic evidence (section 4–2–202), negation or limitation is inoperative to the extent such construction is unreasonable.

*Id.* § 4–2–316(1). Accordingly, the initial inquiry must be whether express warranties were created under section 4–2–313 and if so how they are affected by section 18.01 of the contract.

Plaintiff argues that this case is controlled by section 4–2–313(b) which provides that "[a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." Colo.Rev.Stat. § 4–2–313(b). The principles underlying section 4–2–313 are set out in comment four to that section:

4. In view of the principle that the whole purpose of the law of warranty is to determine what it is that the seller has in essence agreed to sell, the policy is adopted of those cases which refuse except in unusual circumstances to recognize a material deletion of the seller's obligation. Thus, a contract is normally a contract for a sale of something describable and described. A clause generally disclaiming "all warranties, express or implied" cannot reduce the seller's obligation with respect to such description and therefore cannot be given literal effect under Section 2–316.

This is not intended to mean that the parties, if they consciously desire, cannot make their own bargain as they wish. But in determining what they have agreed upon good faith is a factor and consideration should be given to the fact that the probability is small that a real price is intended to be exchanged for a pseudo-obligation.

*Id.* § 4–2–313 comment 4.

Similarly, Professors White and Summers argue that a seller should not be able

to disclaim a warranty created by description.

We hope courts will reach similar conclusions and strike down attempted disclaimers in cases in which the seller includes a description of the article which amounts to a warranty and then attempts to disclaim all express warranties. To illustrate further: assume that the sales contract describes machinery to be sold as a "haybaler" and then attempts to disclaim all express warranties. If the machine failed to bale hay and the buyer sued, we would argue that the disclaimer is ineffective. In our judgment, the description of the machine as a "haybaler" is a warranty that the machine will bale hay and, in the words of 2–316, a negation or limitation ought to be "inoperative" since it is inconsistent with the warranty.

J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code* § 12–3 at 433 (2d ed. 1980).

Plaintiff relies principly on two cases that follow this rationale. *Century Dodge Inc. v. Mobley*, 155 Ga.App. 712, 272 S.E.2d 502, 504 (1980) (*cert. denied*); *Blankenship v. Northtown Ford, Inc.*, 95 Ill.App.3d 303, 50 Ill.Dec. 850, 853–54, 420 N.E.2d 167, 170–71 (1981). In both cases automobile dealers had sold "new" cars which for various reasons did not meet the description of a "new" car. Consequently the courts held that the boilerplate disclaimer provisions of the consumer sales contracts did not relieve the dealers of their responsibility to deliver a "new" car.

We do not question the rationale of the above authorities. Nonetheless, we find them not controlling in the instant case. If in this case we were dealing with a consumer transaction, as in the cases just cited, we would be more inclined to follow those authorities. However, as noted in subsequent cases, "the courts are less reluctant to hold educated businessmen to the terms of contracts to which they have entered than consumers dealing with skilled corporate sellers." *Bowers Manufacturing Co. v. Chicago Machine Tool Co.*, 117 Ill.

App.3d 226, 72 Ill.Dec. 756, 761, 453 N.E.2d 61, 66 (1983) (discussing and distinguishing *Blankenship v. Northtown Ford, Inc.*).

■ Furthermore, both sections 4–2–313 and 4–2–316 express the policy of the statutory scheme to allow parties to make any bargain they wish. Comment four to section 4–2–313 states that if parties consciously desire they can disclaim whatever warranties they wish. Colo.Rev.Stat. § 4–2–313 comment 4 (1973). In addition, comment one to section 4–2–316 explains that its purpose is to "protect a buyer from unexpected and unbargained language of disclaimer." *Id.* § 4–2–316 comment 1. Consequently, we will not rewrite the contract in this case. The exhibits to the contract which described the goods must be read in conjunction with the contract itself. The contract states that the goods are used and there is no guarantee that they are fit or even *operable.*

If we were to hold that the contract in the instant case created undisclaimable express warranties by description, we cannot think of alternative language that would memorialize the intent of the parties—to purchase and sell used "as is" equipment which has value but which may need repairs or additional parts to be fit and operable.

Our holding on this issue does not leave plaintiffs in general without remedy in similar contexts or the plaintiffs in this case with an "empty bargain." If the goods delivered do not meet the description in the contract there is a breach of the contract. In short, if no mast were delivered or if what was delivered was junk metal which in no way resembled a mast, plaintiffs would have a cause of action for breach of the contract.

Finally, plaintiffs did not receive an empty bargain. An appraisal which plaintiffs commissioned valued the goods received at an amount in excess of $3,000,000. Record, supp. vol. 2, Court Exhibit No. 6. The purchase price for the assets was $2,925,000.

The trial court did not err in excluding plaintiffs' evidence regarding breach of warranty.

### Attorneys' Fees

Plaintiffs argue that the trial court made several errors in the proceedings to award attorneys' fees and in the amount of the award.

█ First, plaintiffs allege that the trial court erred in not apportioning the fees to reflect the fees incurred to recover the money owing under the note to which defendant was entitled as opposed to the fees incurred in defending against plaintiffs' claims of breach of contract and warranty.

Colorado follows the general rule that "[i]n the absence of a specific contractual or applicable statutory provision, attorney's fees and expenses of litigation are not ordinarily recoverable." *Lovell Clay Products Co. v. Statewide Supply Co.*, 41 Colo.App. 166, 580 P.2d 1278, 1280–81 (1978). The promissory notes in the instant case contained the following provision: "If action be instituted on this note, the undersigned promises to pay such sums as the court may adjudge reasonable in such action as attorneys' fees." Record, supp. vol. 2, Plaintiffs' Exhibit No. 2 ("Promissory Note").

In response to plaintiffs' argument below that the attorneys' fees must be apportioned, the court found that

all the attorneys' fees here sought by [defendant] were incurred in attempting to recover upon the promissory notes. The evidence at trial showed that [plaintiffs] had an unconditional obligation to pay $2,125,000.00 in principal on those two notes, plus interest. [Defendant] had to litigate in Texas to recover $1,000,000.00 of that amount. It recovered judgment for the remaining $1,125,-000.00, as well as interest on both notes, when this Court directed verdicts for [defendant] during trial. All but two of [plaintiffs'] claims were taken from the jury and decided adversely to it. [Plaintiffs'] insistence upon litigation in three states served primarily, if not solely, to delay [plaintiffs'] payment of its legal obligations. [Defendant] incurred large legal fees in this case simply because its persistence in seeking payment of debts clearly owed to it became more expensive as [plaintiffs'] resistance to paying those debts continued and grew litigious.

Record, vol. 1, at 176.

Plaintiffs urge us to follow the line of cases typified by *Jackson v. Oppenheim*, 533 F.2d 826, 827 (2d Cir.1976). Those cases suggest that fees incurred in defending ancillary claims in conjunction with an action to collect a note cannot be recovered under a provision in the note for attorneys' fees.

We choose not to follow those cases. First, *Jackson* is distinguishable because the attorneys' fees clause involved in that case was much narrower. *Id.* at 830–31. Second, there is no Colorado case on point. Absent such authority we are inclined to follow the interpretation of Colorado law made by the district judge sitting in that state. Finally, the reasoning of the Eighth Circuit in *Duryea v. Third Northwestern National Bank of Minneapolis*, 606 F.2d 823 (8th Cir.1979), is persuasive. In that case a bank was defending claims that it violated inter alia the Bank Holding Company Act. The Bank counterclaimed on a note due from the plaintiff. Addressing an argument similar to that advanced here, the Eighth Circuit quoted approvingly from the trial court in that case:

If the Bank had instituted suit to collect the note and plaintiff had, by way of counterclaim, served the complaint that is the basis of this action, all costs of both bringing suit and defending against the counterclaim would be "costs of collection" of the note. *See Taylor v. Continental Supply Co.*, 16 F.2d 578 (8th Cir.1926). This court sees little difference where plaintiff brings suit to prevent collection of the note. Because it is necessary for the Bank to defend against such an action in order to collect on the note, attorney's fees incurred in defending against plaintiff's suit are a "cost of

collection" as that term is used in the note. A contrary result would permit the maker of a note—by winning the "race to the courthouse"—to coerce settlement. This would render the "cost of collection" provision of little value, apparently contrary to what the parties to the note intended.

*Id.* at 826. The finding of the trial court is consistent with both the facts and the law in this case.

Plaintiffs also argue that the trial court erred in not submitting the determination of attorneys' fees to the jury.

■ The court initially determined that the issue of attorneys' fees would be decided by the jury. In fact defendants presented their evidence to the jury. Subsequent to that presentation, the trial court sua sponte ruled that the matter was one to be determined by the court. The jury was instructed to disregard the evidence presented concerning attorneys' fees. The trial court set a hearing to determine the amount of attorneys' fees to be awarded and informed the parties that additional evidence could be presented at that hearing. Record, vol. 10, at 930–31.

We find no prejudicial error in the trial court's actions. The jury was given a curative instruction to disregard the evidence and the procedure adopted by the trial court is in harmony with Colorado law. *Luby v. Jefferson County Bank of Lakewood,* 28 Colo.App. 441, 476 P.2d 292 (1970) (*cert. denied*). Furthermore the plaintiffs cannot complain that the defendant was allowed to present additional evidence at the subsequent hearing—which evidence plaintiffs were not prepared to rebut. When the trial court ruled that the court would determine the issue of attorneys' fees at a subsequent hearing, the court said:

> I don't think I've got any choice but to decide this matter, and I'm not going to decide it on the basis of the evidence so far submitted. I would like to give the plaintiffs an opportunity for more fully contesting the reasonableness and amounts of the fees that are asserted,

and, likewise, the defendants [sic] an opportunity to present any additional evidence they [sic] may have on attorneys' fees, so that a hearing will be set at a separate later time as soon as application is made for a hearing on attorneys' fees.

Record, vol. 10, at 931.

Finally our review of the record finds sufficient evidence to support the amount of attorneys' fees assessed by the trial court. The trial court's determination of attorneys' fees is sustained.

### Defendant's Cross Appeal

■ The jury awarded damages to the plaintiffs which resulted from a breach of warranty made concerning a replacement mast. Defendant alleges that the trial court's failure to direct a verdict on the issues of lost wages and lost profits was error. Furthermore, they assert that there is insufficient evidence to support the jury's verdict.

We have reviewed the record and found that the plaintiffs elicited sufficient evidence that the lost wages amounted to $1,500.00 per day during the period in question. Similarly, there is evidence in the record from which the jury could find lost profits.

Admittedly the evidence is such that a different trier of fact might reach the opposite conclusion. Defendant, however, does not allege that the trial court improperly instructed the jury. This court will not disturb the verdict of a jury if the case has been submitted on proper and adequate instructions and there is evidence to support the verdict. *E.g., Colorado Coal Furnace Distributors, Inc. v. Prill Manufacturing Co.,* 605 F.2d 499, 502 (10th Cir. 1979); *Lloyd v. Grynberg,* 464 F.2d 622, 625 (10th Cir.1972).

The verdict and rulings of the trial court are in all aspects affirmed.

AFFIRMED.