RAY MARTIN PAINTING,
INC., Plaintiff,

v.

AMERON, INC., Defendant.

No. 85–1022–K.

United States District Court,
D. Kansas.

June 19, 1986.

Paul Thomas, Wichita, Kan., for plaintiff.

Dennis Feeney, Wichita, Kan., for defendant.

## MEMORANDUM AND ORDER

PATRICK F. KELLY, District Judge.

This is a diversity action in which plaintiff Ray Martin Painting, Inc. (Martin) seeks damages for defendant Ameron's alleged breach of express warranties and warranties of fitness for a particular purpose in connection with the sale of industrial paint. Ameron has moved for summary judgment on the ground that the final agreement between the parties excluded any express or implied warranties not contained in that agreement, or in the alternative, that the agreed exclusion of conse-

quential damages bars Martin's claim for damages in its entirety.

Because the court finds the "warranty agreement" signed by both parties was intended to be a final, integrated agreement, evidence of warranties other than those included in the agreement is inadmissible. All other express and implied warranties were effectively disclaimed in the agreement. Accordingly, defendant's motion for summary judgment will be granted.

The court finds the following to be the uncontroverted facts:

Both parties to this lawsuit are experienced business entities which have entered into many contracts and warranty agreements in the past. The plaintiff, Ray Martin Painting, Inc., a Kansas corporation, is a heavy industrial painting contractor. Ameron, a California corporation, is a manufacturer and distributor of an industrial coating known as Amerlock 400.

On March 7, 1983, Martin was requested to submit bids on painting the Derby Refining Company Modernization Project in Wichita, Kansas, to the general contractor. The bid solicitation documents specified the use of Amerlock 400 "or an approved equal" and required the subcontractor to provide a 5–year warranty on the work and on the paint used.

On April 8, 1983, prior to Martin's submission of its bid, Ameron sent Martin a copy of the draft of Ameron's 5–year extended limited warranty proposal. It was, in pertinent part, identical to the final warranty agreement which will be set forth below. Martin received and read two such drafts before signing the final agreement.

On April 25, 1983, Martin was awarded the subcontract for the painting of the Derby project in an amount of $203,400.00. Included in the subcontract was a 5–year written warranty from Martin to the general contractor. This warranty is identical in nature and content to the final warranty agreement between Martin and Ameron.

Shortly after being awarded the contract, Martin received a written price quotation

from Ameron which contained, in pertinent part, the following terms and conditions:

6. Ameron's products are warranted to be free of defects in material or workmanship. ...

IT IS EXPRESSLY UNDERSTOOD THAT AMERON MAKES NO OTHER WARRANTIES CONCERNING THE GOODS, AND THE SOLE REMEDY OF THE BUYER AND THE SOLE LIABILITY OF AMERON FOR PRODUCT DEFECT SHALL BE AS SET FORTH ABOVE. NO OTHER WARRANTIES, EXPRESS OR IMPLIED, WHETHER OF MERCHANTABILITY OR OF FITNESS FOR ANY PARTICULAR USE SHALL APPLY. AMERON SHALL NOT BE RESPONSIBLE FOR CONSEQUENTIAL DAMAGES.

ANY RECOMMENDATION OR SUGGESTION RELATING TO THE USE OF PRODUCTS MADE BY AMERON EITHER IN TECHNICAL LITERATURE OR IN RESPONSE TO SPECIFIC INQUIRY IS GIVEN IN GOOD FAITH, BUT IT IS FOR BUYER TO SATISFY ITSELF OF THE SUITABILITY OF THE GOODS FOR ITS OWN PARTICULAR PURPOSE AND IT WILL BE DEEMED TO HAVE DONE SO.

7. Buyer hereby waives the benefit of any rule that disclaimers of warranty or limitation of liability shall be construed against Seller and agrees that the disclaimers and limitations applicable to this transaction shall be construed liberally in favor of Seller.

8. No statement or recommendation made or assistance given by the Seller or its representatives to the Buyer or its representatives in connection with the use of any products by the Buyer shall constitute a waiver by the Seller of any of the provisions herein or affect the Seller's liability, as herein defined.

9. There are no understandings or agreements between the Buyer and the Seller relative hereto which are not fully expressed herein, and no change made herein (or in the product warranty provided to Buyer by Seller) shall be valid

unless it is made in writing and signed by a duly authorized officer of Seller.

On May 12, 1983, Mr. Martin, president of Ray Martin Painting, signed the final warranty agreement. The pertinent sections are as follows:

SECTION 2—WARRANTY

AMERON warrants, subject to the terms and conditions contained herein, that the PRODUCT is free of defects and that when PRODUCT is shipped, stored, applied, cured and used in accordance with the Ameron Technical Literature ... and the applicable Specifications ... that it will not under normal operating conditions fail for a period of five (5) years from the date that PRODUCT goes into service.

SECTION 3—DEFINITIONS

3.1 The words "fails" or "failure" shall be manifested by the active corrosion of the steel substrate equivalent to RE–2 or worse, European scale of degree of rusting of anti-corrosive paints or ASTM D610, caused by defective materials or by application error.

. . . . .

3.2 *The word "defect" shall mean an error in formulation, manufacture or design, which affects the performance of PRODUCT and demonstrates the outward manifestations of failure as set forth in paragraph 3.1 above.*

SECTION 7—OBLIGATION TO RE-PAIR

7.1 In the event that there is a failure or defect which is covered by the terms and conditions of this WARRANTY, AMERON will supply sufficient new coating material to repair or replace the affected area(s).

7.2 AMERON'S exclusive liability and the CUSTOMER'S sole remedy hereunder or otherwise be limited to the remedies set forth in paragraph 7.1 above.

. . .

SECTION 10—NO OTHER WARRANTIES

10.1 Except as set forth herein, AMERON makes no other warranties, express or implied, including any implied warranty of merchantability or fitness for a particular use, with respect to the PRODUCT.

10.2 CUSTOMER agrees to be bound by and accepts this WARRANTY as its sole and exclusive remedy with regard to failures or defects of the PRODUCT. CUSTOMER hereby waives any claim in tort and agrees to be limited to the remedies set forth in this agreement.

10.3 *No terms or conditions other than those stated herein, or no other agreement or understanding, oral or written, in any way purporting to modify this WARRANTY shall be binding upon AMERON unless made in writing and signed by an authorized representative of AMERON.*

SECTION 14—DAMAGES

CUSTOMER specifically agrees that AMERON shall not be liable to CUSTOMER for any consequential damages of whatever description. In no event shall damages exceed the original cost for application of the PRODUCT to the surface, plus replacement material and shall be limited by Section 7.1 above.

(Emphasis added.)

As previously stated, all prior drafts which were sent to Martin were nearly identical to this final warranty agreement. Before signing the final draft, Martin requested two wording changes which were agreed to by Ameron. Martin requested no other changes prior to signing the warranty agreement.

The basis of Martin's lawsuit is that Ameron expressly and impliedly warranted the Amerlock 400 coating could be applied to a 5–mil thickness with one application. According to Martin, the warranty was made through statements contained in Ameron's product brochures and the statement of an Ameron representative. Martin does not contend that Ameron has breached the express warranty against corrosion contained in the warranty agreement.

The Ameron product brochure contained the following statement which is the basis of the alleged express warranty:

A single 5–mil coat provides extended-term protection, whereas conventional paint requires two or three coats for only short-term protection. Amerlock 400 can even be spray applied in thicknesses up to 8 mils in one coat, an especially important feature when angular surfaces are being coated.

However, the product brochure also provided:

*Equipment*

Airless or conventional spray.

(Can also be applied by brush or roller, *but additional coats may be required to obtain proper thickness.*)

*Warranty*

Ameron's products are warranted to be free of defects in material or workmanship. ... Ameron's sole obligation under this Warranty shall be at its option, to credit Buyer's account, or to supply replacement material or repair. ...

*It is expressly understood that Ameron makes no other warranties concerning the goods, and the sole remedy of the Buyer and the sole liability of Ameron for product defect shall be as set forth above.* No other warranties, express or implied, whether of merchantability or of fitness for any particular use shall apply. Ameron shall not be responsible for consequential damage.

Any recommendation or suggestion relating to the use of the products made by Ameron either in technical literature or in response to specific inquiry is given in good faith, but it is for Buyer to satisfy itself of the suitability of the goods for its own particular purpose and it will be deemed to have done so.

(Emphasis added.)

The instructions for application of the Amerlock 400, which Martin received with the paint, contained an identical statement regarding the need for more than one coat when using a brush or roller, as well as an identical warranty statement.

Shortly after Martin's workers began on the Derby project, they complained to Ameron that they could not build the paint to a thickness of 5–mils with only one application without the paint sagging or running. In response, Ameron sent a technical service representative to the job site. The service representative conducted a "spray-out" test on a tank with one of Martin's employees, and that employee was then able to build a 7 to 8–mil wet thickness, although Martin claims this surface was of a different type than that actually being painted. In the service representative's opinion, Martin's problems were attributable to failure to follow customary "paint practices." Martin denies this and contends the failure of its workers to build the paint to a 5–mil thickness was due to the defectiveness of the paint.

As a result of the claimed breach of warranties, Martin seeks $250,000.00 in damages. This amount is the sum of the cost of additional product and labor expenditures in applying two coats of the Amerlock 400, and lost profits on the Derby job.

### Discussion

In passing upon a motion for summary judgment, the court is required to view the facts in the light most favorable to the party opposing the motion and give that party the benefit of all reasonable inferences to be drawn from the underlying facts disclosed in pleadings and affidavits. *United States v. Diebold,* 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Thus, the defendant must establish its right to judgment as a matter of law; there must be no genuine issue of fact and no room for doubt or controversy. *Williams v. Borden,* 637 F.2d 731 (10th Cir.1980).

### Express Warranties

As the basis of its claim for breach of express warranties, Martin relies on a statement by an Ameron representative and a statement in the product brochure that Amerlock 400 could achieve a 5–mil thickness with only one coat. This warranty was not contained in the final warranty

agreement between the parties. Under Kansas law—which the parties have agreed is to be applied—an express warranty may be created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

K.S.A. 84–2–313.

Accordingly, it has been held that statements made by an authorized representative or employee of the seller may become an express warranty. *Transamerica Oil Corp. v. Lynes, Inc.,* 723 F.2d 758, 762 (10th Cir.1983). Also, advertising, or representations contained in product brochures, may form part of an express warranty in some circumstances. *Transamerica,* 723 F.2d at 762; *Scheuler v. Aamco Transmissions,* 1 Kan.App.2d 525, 528, 571 P.2d 48 (1977); *see also Select Pork, Inc. v. Babcock Swine, Inc.,* 640 F.2d 147 (8th Cir.1981).

Whether the statements about the coating ability of the Amerlock created an express warranty depends on whether they were "part of the basis of the bargain" which, under Kansas law, requires some type of reliance on the part of the buyer. *Owens Corning Fiberglas Corp. v. Sonic Development Corp.,* 546 F.Supp. 533, 541 (D.Kan.1982) (applying Kansas law).

Ameron argues that Martin could not have relied on these statements in view of the fact the product brochure contained statements that more than one coat would be required when a brush was used (Martin used a brush on approximately 35% of the surface), and that the only warranty was for "defects" in material or workmanship. "Defect", as defined in the warranty agreement, is a failure of the product resulting in corrosion—not failure to achieve a 5–mil thickness.

Martin, on the other hand, argues it did indeed rely on the representations of "5–mils/one coat" and that, under Kansas law, an express warranty, once made, cannot be excluded. Martin further contends that since the warranty against "defects" was contained in the product brochure wherein "defect" was not defined, the word should be interpreted to mean "an inability to achieve a 5–mils thickness with one application."

Plaintiff's arguments ignore the effect of the parol evidence rule on this transaction. Even if this court were to assume the "5–mils/one coat" statement creating an express warranty, the parol evidence rule would preclude the admissibility of evidence of that warranty if the "warranty agreement" was intended by the parties herein as their final, integrated agreement.

Section 2–316(1) of the Uniform Commercial Code as adopted in Kansas provides for the modification and exclusion of warranties:

Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this article on parol or extrinsic evidence (K.S.A. 84–2–202), negation or limitation is inoperative to the extent such construction is unreasonable.

Comment (1) to this section explains that its purpose is to "protect a buyer from unexpected and unbargained language of disclaimer." K.S.A. 84–2–316, Official U.C.C. Comment (1). Comment (4) to § 2–313 sheds further light:

In view of the principle that the whole purpose of the law of warranty is to determine what it is that the seller has in essence agreed to sell, the policy is adopted of those cases which refuse except in unusual circumstances to recognize a material deletion of the seller's obligation. Thus, a contract is normally a contract for a sale of something describable and described. A clause generally disclaiming "all warranties, express

or implied" cannot reduce the seller's obligation with respect to such description and therefore cannot be given literal effect under Section 2–316.

*This is not intended to mean that the parties, if they consciously desire, cannot make their own bargain as they wish.* But in determining what they have agreed upon, good faith is a factor and consideration should be given to the fact that the probability is small that a real price is intended to be exchanged for a pseudo-obligation.

K.S.A. 84–2–313, Official U.C.C. Comment (4), (emphasis added).

K.S.A. 84–2–202 declares that when a writing is intended by the parties "as a final expression of their agreement," its terms may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement, and if the parties intended the contract to be the "complete and exclusive" statement of their agreement, it may not be supplemented even by noncontradictory terms.

█ The final warranty agreement involved herein provided that "no terms or conditions other than those stated herein, or no other agreement or understanding, oral or written, in any way purporting to modify this warranty, shall be binding upon Ameron. ..." Thus, by the contract's express terms, it constituted the entire understanding between the parties. Other courts applying the UCC's provisions to similar "integration clauses" have found that such language is sufficient to render the contract the final and exclusive agreement of the parties, thus preventing the introduction of parol evidence of other warranties. *See, e.g., ARB, Inc. v. E–Systems, Inc.,* 663 F.2d 189 (D.C.Cir.1980); *Franz Chemical Corp. v. Philadelphia Quartz Co.,* 594 F.2d 146 (5th Cir.1979); *Jaskey Finance & Leasing v. Display Data Corp.,* 564 F.Supp. 160 (E.D.Pa.1983). *See also,* B. Clark & C. Smith, *The Law of Product Warranties* ¶ 4.04[2], at 4–40 (1984).

In reaching a conclusion as to whether the parties intended the agreement to be their final and complete agreement, the court may consider that both parties involved are merchants who had equal bargaining power with respect to the subject matter of their transaction, and that there is no suggestion the plaintiff was unaware of the significance of the disclaimer and integration clauses which were part of the contract. *Universal Drilling Co. v. Camay Drilling Co.,* 737 F.2d 869, 874 (10th Cir.1984) (" 'the courts are less reluctant to hold educated businessmen to the terms of contracts to which they have entered than consumers dealing with skilled corporate sellers,' " *quoting Bowers Manufacturing Co. v. Chicago Machine Tool Co.,* 117 Ill. App.3d 226, 72 Ill.Dec. 756, 761, 72 Ill.Dec. 756, 453 N.E.2d 61 (1983)); *Jaskey Finance & Leasing,* 564 F.Supp. at 164; *Union Exploration Co., Inc. v. Dowell Division, the Dow Chemical Co.,* unpublished No. 83–1866 (D.Kan. July 8, 1985).

In *Transamerica Oil Corp. v. Lynes, Inc.,* 723 F.2d at 763, the Tenth Circuit stated that the question of whether the parties intended that a document constituted the final expression of their agreement is *usually* one of fact. However, the facts of *Transamerica* are clearly distinguishable from those of the case at bar. In *Transamerica* the circuit court affirmed this court's holding that an invoice was not intended to be the final agreement between the parties. The court noted "[t]here was no negotiated document signed by both parties evidencing the sale of one or all of these packers; [plaintiff] apparently entered the purchase orders personally or by telephone. The written documents the defendants rely on were each entitled 'sales and Service Invoice.' ... [The] words indicate that the document is a delivery receipt and possibly a billing statement, but not a fully integrated contract." 723 F.2d at 763. In contrast, the words in the warranty agreement between the parties herein clearly indicate it was intended as the final agreement between them. Due to the presence of the integration clause in this extensively negotiated agreement, the court is able to find as a matter of law that

the parties intended the agreement to be final and exhaustive.

 Despite the general rule that express warranties, once made, may not be disclaimed, courts will uphold disclaimers if the parties clearly intended to finalize their agreement in one writing. For instance, in *Jordan v. Doonan Truck & Equipment, Inc.*, 220 Kan. 431, 552 P.2d 881 (1976), the Kansas Supreme Court refused to admit parol evidence of an oral express warranty when both parties had read and signed a sales contract containing a disclaimer handwritten across its face. It ruled that in these circumstances the parties intended the purchase contract to be the final expression of their agreement. *See also AgriStor Leasing v. Meuli*, 634 F.Supp. 1208 (D.Kan.1986); *contra Jensen v. Seigel Mobile Homes Group*, 105 Idaho 189, 668 P.2d 65 (1983) (in a consumer transaction a general disclaimer in the sales contract is ineffective to disclaim quality representations made in the owner's manual). Courts are even more likely to "hold the parties to their bargain" when two commercial parties are involved. *See e.g., Jaskey Finance & Leasing*, 564 F.Supp. at 160 (contract between two commercial parties which contained integration clause and disclaimed warranties barred introduction of warranty made in sales brochure); *Redfern Meats, Inc. v. Hertz Corp.*, 134 Ga.App. 381, 215 S.E.2d 10 (1975) (where lease service agreement contained integration clause, parol evidence rule barred introduction of express warranty made in advertising brochure); *see also Citicorp Leasing, Inc. v. Allied Institutional Distributors, Inc.*, 454 F.Supp. 511 (W.D.Okla.1977).

Both §§ 84-2-313 and 84-2-316 express the policy of the statutory scheme to allow parties to make any bargain they wish. Comment (4) to § 2-313 states that if parties consciously desire, they can disclaim whatever warranties they wish. In addition, comment (1) to § 2-316 explains its purpose is to "protect a buyer from *unexpected* and *unbargained* language of disclaimer." (Emphasis added.) Courts will not rewrite contracts between two parties

of equal bargaining power. *Universal Drilling*, 737 F.2d at 874. In this case the warranty against "defects" in the sales brochure must be read in conjunction with the contract itself, wherein "defect" is defined as "corrosion". The contract only warrants against corrosion after application of the paint, not failure of the paint to achieve a 5 mil thickness with one application.

Because allowing plaintiff to base an express warranty claim on language not present in the contract would be inconsistent with the integration clause, plaintiff's express warranty claim fails as a matter of law and defendant is entitled to summary judgment thereon.

*Implied Warranty of Fitness*

The same result must be reached on the issue of implied warranties of fitness for a particular use since such warranties have been expressly and adequately disclaimed. K.S.A. 84-2-316(2) governs exclusion and modification of implied warranties:

[T]o exclude or modify any implied warranty of fitness, the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "there are no warranties which extend beyond the description on the face hereof."

Since the disclaimer of the implied warranty of fitness in the present contract is in writing as required by the code, the primary issue remaining to be addressed is whether the disclaimer of the implied warranty of fitness is "conspicuous". A clause is conspicuous when it is "so written that a reasonable person against whom it is to operate ought to have noticed it." K.S.A. 84-1-201(10). The decision as to whether a term is conspicuous is to be made by the court. K.S.A. 84-1-201(10).

 In the instant case, the section disclaiming the implied warranty was demarcated by an upper case heading, was in enlarged, easily readable type (no fine print), and the language was simple, direct and easily understood. An exclusion of the

implied warranty of fitness has been held to be conspicuous, even though the print of the excluding language was in regular or smaller type, where the heading preceding the exclusion is imprinted in larger type, as here. *Transurface Carriers, Inc. v. Ford Motor Company,* 738 F.2d 42, 46 (1st Cir. 1984); *see also Avenell v. Westinghouse Elec. Corp.,* 41 Ohio App.2d 150, 324 N.E.2d 583 (1974). Moreover, the same disclaimer is contained in the sales brochure, the price quotation, and all invoices, wherein it is printed in larger and contrasting type. Such bold type satisfies the "conspicuousness" requirement under Kansas law. *See J & W Equipment, Inc. v. Weingartner,* 5 Kan.App.2d 466, 467–68, 618 P.2d 862 (1980); *see also Delhomme Industries, Inc. v. Houston Beechcraft, Inc.,* 669 F.2d 1049 (5th Cir.1982) (applying Kansas law).

The court finds that as a matter of law the disclaimer was "conspicuous" within the meaning of 2–316(2). It is noteworthy that if the court had not so found, the buyer's *awareness* of the disclaimer causes it to be effective even though it is inconspicuous. *Twin Disc, Inc. v. Big Bud Tractors, Inc.,* 772 F.2d 1329, 1334 (7th Cir.1985); *Office Supply Company, Inc. v. Basic Four Corp.,* 538 F.Supp. 776, 784–86 (E.D.Wis.1982). Moreover, some courts have held that where two commercial parties are involved, it is irrelevant whether the disclaimer is conspicuous. *AMF, Inc. v. Computer Automation, Inc.,* 573 F.Supp. 924, 929–30 (S.D.Ohio 1983).

In this case, the implied warranty of fitness was properly disclaimed and the defendant is entitled to summary judgment on such claim.

Having determined that defendant is entitled to summary judgment on both of plaintiff's theories of recovery, there is no need to consider defendant's alternative argument that the exclusion of consequential damages bars plaintiff's prayer for damages in its entirety.

IT IS ACCORDINGLY ORDERED this 19 day of June, 1986, that defendant's motion for summary judgment should be and is granted in its entirely, and this action is dismissed.