Stuart A. JACKSON, Appellant,

v.

Jack OPPENHEIM, Appellee.

No. 531, Docket 75–7008.

United States Court of Appeals,
Second Circuit.

Argued Feb. 20, 1976.

Decided April 5, 1976.

James J. Maloney, New York City (Leonard R. Glass, Lionel A. Barasch, Glass, Greenberg, Irwin & Pellman, New York City, of counsel), for appellant.

Peter Fleming, Jr., New York City (Douglas K. Mansfield, Curtis, Mallet-Prevost, Colt & Mosle, New York City, of counsel), for appellee.

Before FEINBERG, OAKES and VAN GRAAFEILAND, Circuit Judges.

OAKES, Circuit Judge:

Appeal is from an adverse judgment on appellant's federal securities law claims in connection with the sale to him of 10 per cent of the stock owned by appellee in Chelsea House Educational Communications, Inc. (Chelsea House), and from an award of $12,850 attorneys' fees and costs to appellee as "costs of collection" under the terms of two promissory notes for $16,926 each, given in consideration of the purchase, on which appellee successfully counterclaimed below. Judgment denying relief under Section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(2), and Section 10(b) (and Rule 10b–5) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and awarding judgment on the counterclaim was entered by the United States District Court for the Southern District of New York, Charles H. Tenney, *Judge*, sitting without a jury. Appellant relies on appeal solely on his Section 12(2) claim and disputes the award of attorneys' fees. We affirm the judgment as to the former and reverse and remand as to the latter.

Chelsea House was a New York City publishing firm founded on a shoestring in 1966 by Harold Steinberg, its president, and Robert Hector, its board chairman.[1] After a measure of late 1960's success, based primarily on its well-known revival of the *1897 Sears, Roebuck Catalogue,* the firm filed a

petition for reorganization in bankruptcy on July 2, 1970.[2] In early 1969 when Chelsea House was riding the crest of financial success with the *Sears, Roebuck Catalogue* sales, Steinberg contacted appellant Stuart Jackson's law firm, Rogers & Wells, for the purpose of having an SEC registration statement prepared so as to "go public." Appellant then served as secretary and as an "outside" director of Chelsea House from June, 1969, until July, 1970, when the petition for reorganization was filed.

Appellee Jack Oppenheim owned approximately 20 per cent of Chelsea House stock and had served as a director and a vice president of the firm. During early 1970, Oppenheim was troubled by the unfavorable outlook of Chelsea House finances; his concern was no doubt in part triggered by a January, 1970, audit from Price, Waterhouse, revealing a $30,000 operating loss for fiscal 1969, note 2 *supra.* This same report also indicated a decrease in net worth from $218,743 on April 30, 1969, to $85,097 on October 31, 1969. This report was, of course, delivered to all directors of Chelsea House, including Jackson. Only Oppenheim, however, decided that the situation was sufficiently critical to require immediate action.

Oppenheim was particularly concerned with a lack of organized procedures for publication decision-making and felt that Steinberg should be removed as president and replaced with an experienced publishing executive. After some unsuccessful efforts to seek changes within management, Oppenheim resigned as a vice president on March 6, 1970, but remained a director. A week later Oppenheim went to Jackson's office to discuss with his fellow director the need for new management. Oppenheim cited examples of cash flow problems, avoidance of creditors and the firm's inability to obtain necessary financing because of al-

---

1. The original project which launched the enterprise required a total investment of $390. *See* "The Chelsea Boys and How They Grew," New York Magazine, Mar. 2, 1970, at 49 (Defendant's Ex. A).

2. The *1897 Sears, Roebuck Catalogue* sold over 130,000 copies at $14.95 each in 1968 and 1969, *see* "The Chelsea Boys and How They Grew," note 1 *supra,* at 50. But the firm showed a net operating loss of over $30,000 for the fiscal year ending on October 31, 1969.

leged mismanagement [3] and asked Jackson's assistance in replacing Steinberg. After a 15- or 30-minute discussion, however, Jackson refused to help and stated only that he would talk about the situation further with other directors if they called him about it.

In the following week, Oppenheim prepared a memorandum, couched in terms of a proposal for action by the board of directors, setting forth all his objections to the Chelsea House management and listing several concrete steps he considered necessary for the firm's financial survival.[4] Among the dire forecasts made in this memorandum, Oppenheim specifically argued that if the recommended changes were not accepted "[c]ircumstances could contrive shortly which would bankrupt the company, leaving creditors unpaid." Oppenheim gave the memorandum to the board chairman for distribution to all directors and sent it himself to two of the management group, making what Judge Tenney found to be a reasonable effort to circulate the memorandum to all concerned. Jackson, however, never received his copy.[5]

Steinberg then decided to approach Oppenheim to buy out his holdings of Chelsea House stock and did so through an intermediary employee. Oppenheim agreed to sell out to a management group at $3 per share. Steinberg himself solicited a group of purchasers from among Chelsea's management and eventually found eleven persons, including appellant, both within and without the Chelsea House family who jointly agreed to purchase Oppenheim's 146,618 shares. At no time did Oppenheim solicit any of these buyers, and it is undisputed that he made no statements or representations in connection with the sale. The sale, at $3 per share, was closed on April 10, 1970. Jackson received 14,618 shares for which he paid $10,000 and signed two promissory notes, due one and two years later, for $16,926 each. Three months later Chelsea House was in bankruptcy as Oppenheim had forecast.

### Section 12(2) Claim.

Jackson's Section 12(2) claim is that Oppenheim

> offered to and did sell his Chelsea House stock to plaintiff and others . . . by means of certain oral communications that omitted to state material facts about the fast declining financial situation at Chelsea House which were necessary in order to make the statements, made by defendant, in light of the circumstances under which they were made, not misleading.

The Section 12(2) violation allegedly occurred when Oppenheim came to appellant's office on March 13, 1970, to discuss Chelsea House and did not, at that time or subsequently, inform him of particular matters mentioned only in appellee's subsequent memorandum. The argument is that certain omitted facts, relating to specific instances of management incompetence and financial distress,[6] were necessary in order

---

3. Oppenheim mentioned that he was especially concerned that the New York Magazine article, see note 1 supra, which emphasized Steinberg's flamboyance (e. g., having a "topless secretary"), portrayed management as entirely too flighty to obtain credit or financing from serious business sources.

4. These included (1) hiring a new president; (2) electing Oppenheim as chairman of the board; (3) hiring a new controller; (4) reallocating management responsibilities below the president's level; (5) establishing an editorial board (with eight members) to determine which projects should be undertaken; and (6) allocating certain income of the firm (when feasible) to a fund for sponsoring new books by promising writers.

5. When appellee sent the memorandum to Hector as chairman of the board, he requested that all the proposals be scheduled for a vote at the next meeting. The district court found that in this situation he could reasonably have expected its circulation by Hector, and there is no evidence of any attempt by Oppenheim to restrict its distribution.

6. The following information in the late-March memorandum was found to be "material" by Judge Tenney in connection with the Section 10(b) claim:

1. No one realized that the Buck Rogers book could not make a profit until it sold 25,000 copies until after the book was in the book stores.

to make the March 13, 1970, statements of Oppenheim "not misleading." That is, although Oppenheim verbally painted a bleak picture with certain details of the firm's difficulties. Jackson claims he was misled by the absence of further particular details supplied in the subsequent memorandum (which he never received), and that this allegedly misleading oral communication was a causal factor in his decision to participate in the purchase of Oppenheim's stock.

Judge Tenney, without reaching the question whether appellant had proven a prima facie case for liability under Section 12(2), ruled that appellee had sustained his burden of proving that "he did not know, and in the exercise of reasonable care could not have known, of [the alleged] untruth or omission." 15 U.S.C. § 77*l*(2); see Hill York Corp. v. American International Franchises, Inc., 448 F.2d 680 (5th Cir. 1971). In the judge's view, the efforts made by Oppenheim to circulate fully his late-March memorandum, see note 5 supra, as well as his admitted willingness to pursue further his discussions of Chelsea House with Jackson were proof that he had used reasonable care to avoid omission of material facts which could have misled appellant. While there is a considerable appeal to this view, we choose not to rely upon it.[7]

Our view is that appellant has wholly failed to prove a cause of action under Section 12(2) because he has not shown that the securities involved here were offered for sale or sold "by means of a prospectus or oral communication" containing a misstatement or misleading statement. There was in fact no statement whatever made by Oppenheim regarding his stock subsequent to his verbal agreement with Steinberg's intermediary to sell for $3 per share. Oppenheim made absolutely no representations to the intermediary or other buyers in connection with the sale. The only communication upon which appellant can rely is his March 13, 1970, discussion with appellee regarding deficiencies in the Chelsea House management. Yet it is undisputed that no sale was contemplated or discussed at the March 13 meeting. While appellant need not prove that the alleged "misleading nature" of his March 13, 1970, discussion with appellee "caused" the eventual purchase of Oppenheim's stock by Jackson, see Hill York Corp. v. American International Franchises, Inc., supra, 448 F.2d at 696, he must still prove that the challenged sale was effected "by means of" the communication viewed as a whole. That is to say, the communication as a whole must have been instrumental in

2. The publicity department ran costly ads in the newspapers when the books which were the subject of those ads were not in the stores.

3. Books were added to the Chelsea House book list that no one had seen, let alone read, and without any preliminary production and editorial costing.

4. Management produced films without scripts, without school curricular orientation and largely without purchasers.

5. The national sales manager of History Machine, the company's most important asset, was totally inexperienced and without background to handle that job and the controller had no prior experience in fiscal matters as demonstrated by inability to approximate year-end earnings two months after the 1969 fiscal year ended.

6. The company was near the end of its credit with Random House and the banks and forced to spend inordinate time deflecting various creditors.

7. Current liabilities exceeded current assets by $500,000 and bankruptcy was imminent.

7. The statute specifically requires the defendant to show that by the exercise of reasonable care he "could not have known" of the omission, not merely that "he had used reasonable care" to avoid or correct the omission. 15 U.S.C. § 77*l*(2). It is true that in some cases evidence of steps taken to avoid or correct an omission in a communication would negate reasonable knowledge that an omission existed. Thus, broad, corrective publication of information might well bear on whether a defendant could reasonably have known of a continuing material omission in the knowledge of buyers with whom he has communicated. But reasonable effort to extinguish ignorance does not necessarily prove reasonable unawareness of continued ignorance. Since we find that appellant has not made out a cause of action under Section 12(2) in any case, we need not determine the precise scope of the "reasonable care" defense or whether Judge Tenney was correct in concluding that it applied in this case.

the sale of Oppenheim's shares of Chelsea House stock.[8] The findings of the trial court in connection with the 10b–5 claim [9] plainly indicate the complete absence of relation between the March 13 communication (or misleading omissions from same) and the appellant's purchase of appellee's stock. The court found that (1) Jackson wholly ignored Oppenheim's warnings about Chelsea House's prospects on March 13, (2) Jackson would not have altered his course of conduct had he seen the late-March memorandum, (3) Jackson and Oppenheim never discussed the possibility of a sale, (4) Oppenheim never represented anything to anyone in connection with the sale except that he would sell for $3 per share, and (5) Jackson decided to buy *in the face of* Oppenheim's strong warnings of management incompetence and financial difficulties at Chelsea House. Oppenheim's warnings of March 13 (which quite plainly discouraged rather than encouraged acquisition of Chelsea stock) were in short wholly ignored by appellant and would have continued to be ignored even if he had seen the late-March memorandum. Thus, in no meaningful sense could we conclude that this sale was effected "by means of" the challenged communication. While appellant need not show that the alleged misleading communication had a "decisive effect" on his decision to buy, he must show it at least stands in some causal relationship to that decision. *See Johns Hopkins University v. Hutton,* 422 F.2d 1124, 1130 (4th Cir. 1970); note 8 *supra.*[10] Since the evidence is clear that the challenged communication was neither intended nor perceived as instrumental in effecting the sale, there is no liability under Section 12(2).

## Attorneys' Fees.

Appellee's award of attorneys' fees on his counterclaim was based upon the following provision in each note:

> If this note is placed with an attorney for collection the maker shall pay all costs of collection, including, but not limited to, counsel fees, which fees shall be added to the unpaid balance of this note and be recoverable with and as part thereof.[11]

8. We are aware, of course, that the statement that "reliance" need not be proven by plaintiffs in 12(2) actions has been broadly read by several courts. *See, e. g., Clegg v. Conk,* 507 F.2d 1351, 1356–57 (10th Cir. 1974), *cert. denied,* 422 U.S. 1007, 95 S.Ct. 2628, 45 L.Ed.2d 669 (1975); *Gilbert v. Nixon,* 429 F.2d 348, 356–57 (10th Cir. 1970); *Johns Hopkins University v. Hutton,* 422 F.2d 1124, 1129–30 (4th Cir. 1970). Their purport is that a plaintiff need not prove that the challenged communication had a "decisive effect" in his decision to buy the stock. *Id.* at 1130. *See also Woodward v. Wright,* 266 F.2d 108, 116 (10th Cir. 1959). But we do not view those cases as suggesting that the requirement that the sale or offer be "by means of" a misleading communication should have no meaning whatsoever. Where liability is not based on an *offer* containing a misleading communication, *see* note 10 *infra;* 3 L. Loss, Securities Regulation 1704 (2d ed. 1961), but is based on a *sale,* Section 12(2) requires there to be some causal relationship between the challenged communication and the sale, even if not "decisive." In short, the communication must have been intended or perceived as instrumental in effecting the sale.

9. Judge Tenney found in connection with the Section 10(b) and Rule 10b–5 claim that appellant had not shown reliance, Note, *The Re-* *liance Requirement in Private Actions Under SEC Rule 10b–5,* 88 Harv.L.Rev. 584, 597–600 & n. 75 (1975); due care on his part, *Hafner v. Forest Laboratories, Inc.,* 345 F.2d 167, 168 (2d Cir. 1965); or scienter on the part of appellee, *Lanza v. Drexel & Co.,* 479 F.2d 1277, 1306 (2d Cir. 1973) (en banc). Appellant does not argue that these conclusions or the factual underpinning on which they were based were clearly erroneous and as we have said does not press the 10b–5 claim on appeal.

10. The situation is entirely different, of course, where liability is based on a misleading prospectus constituting an offer of sale. In such cases liability may be based on the misleading "offer" by prospectus even though the prospectus is mailed after the confirmation of the sale. *See Demarco v. Edens,* 390 F.2d 836, 841 (2d Cir. 1968). This result can be understood as an ancillary enforcement mechanism for the requirement in SEC Rule 256(a)(2) that the offering circular be sent prior to confirmation of payment. *See* 6 L. Loss, Securities Regulation 3833 (2d ed. Supp.1969).

11. Appellee had requested $12,020.25 for attorneys' fees and $1,576.40 for "costs," for a total award of $13,596.65. The court approved a total award of $12,850.

Appellant contends that the award was improper because this provision was intended to cover only fees expended in "collection" on the notes, and *not* fees incurred in defense of an ancillary federal securities law claim.

■ The costs and fees provision in the notes is, of course, to be construed in accordance with the law of New York, the state in which the notes were made, delivered and to be paid. Under that law a covenant in a note providing that the obligor shall pay attorneys' fees expended in "collection" of the note is enforceable. *See Swiss Credit Bank v. International Bank, Ltd.,* 23 Misc.2d 572, 573, 200 N.Y.S.2d 828, 830 (Sup.Ct., N.Y.Co.1960); *First National Bank & Trust Co. v. Conzo,* 169 Misc. 268, 7 N.Y.S.2d 334 (Sup.Ct., Chemung Co. 1938). Appellant's claim is that the term "collection" cannot have been used to include defense of all actions "incidental" to the integrity of the notes.

■ We agree with appellant that some language more express than "costs of collection" should have been employed to have placed him on notice that he was undertaking to protect the obligee from costs incurred in defending a separate claim regarding validity of the underlying sale transaction under the federal securities laws. The only similar case cited to us under New York law was based on a note which provided for recovery of "all expenses (*including expense for legal services of every kind*) *of, or incidental to,* the enforcement of any of the provisions hereof . . . ." *Tartell v. Chelsea National Bank,* 351 F.Supp. 1071, 1079 n. 5 (S.D.N.Y. 1972) (emphasis added), *aff'd,* 470 F.2d 994 (2d Cir. 1972). That language could readily be construed to cover fees for the defense of "incidental" claims. But here the note in no manner suggested liability for fees for defending the federal security law claim *merely* because appellee might counterclaim for collection on the notes. At the very least the law of New York is unsettled on this point, and we would be reluctant to imply a result under that law which would conflict with the general "American rule" against awarding fees against a losing party, *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), except as authorized by statute, *e. g.,* Securities Act of 1933, § 11(e), 15 U.S.C. § 77k(e), Securities Exchange Act of 1934, § 9(e), 15 U.S.C. § 78i(e); where the suit or defense is vexatious or in bad faith, *e. g., Vaughan v. Atkinson,* 369 U.S. 527, 531, 82 S.Ct. 997, 999, 8 L.Ed.2d 88, 92 (1962); or where there is a common fund or benefit for a readily identifiable, limited class of beneficiaries, *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 392–97, 90 S.Ct. 616, 625–28, 24 L.Ed.2d 593, 606–609 (1970). *Cf. Aid Auto Stores, Inc. v. Cannon,* 525 F.2d 468, 471 (2d Cir. 1975) (no fees under § 11(e) of Securities Act of 1933 unless suit brought frivolously or in bad faith). The underlying policy forwarded, at least in connection with the securities law claims, is that of avoiding undue discouragement of the bringing of non-frivolous claims; it seems equally applicable where the claim for fees is based on a provision of state law (including state contract law).

■ It is therefore necessary to remand this case to the district court for the limited purpose of recomputing appellee's award for costs and fees in accordance with this opinion. The district judge may, of course, award appellee costs and fees at any standard or customary collection rate applicable to notes in the area of this litigation, or take into consideration whatever other relevant evidence is offered.[12] There being no indication on this record that appellant's securities law claim was frivolous or brought in bad faith, any award of fees on this account is inappropriate. In all other respects, the judgment is affirmed.

Judgment affirmed in part and reversed and remanded in part.

12. We express no opinion on the applicability of N.Y.C.P.L.R. § 8303(a)(2) (McKinney Supp. 1975) on this score.