**TOWERS CHARTER & MARINE CORPORATION, Plaintiff–Appellant, Counter–Defendant,**

v.

**CADILLAC INSURANCE COMPANY, Defendant–Appellee, Counter–Plaintiff,**

v.

**Steven HOFFENBERG, Additional Defendant on the Counterclaim–Appellant.**

**No. 189, Docket 89–7486.**

United States Court of Appeals, Second Circuit.

Argued Oct. 26, 1989.

Decided Jan. 17, 1990.

Jay D. Fischer, New York City (Alan H. Finkel, Proskauer Rose Goetz & Mendelsohn, Eugene Mittelman, Alan Lecht, Kenneth P. Horowitz, Dreyer and Traub, New York City, on the brief), for plaintiff-appellant, counter-defendant and additional defendant on the counterclaim-appellant.

Michael S. Davidson, New York City (Robert C. LaMont, Jacob, Medinger & Finnegan, New York City, on the brief), for defendant-appellee, counter-plaintiff.

Before OAKES, Chief Judge, and KEARSE and ALTIMARI, Circuit Judges.

KEARSE, Circuit Judge:

Plaintiff-counterclaim-defendant Towers Charter & Marine Corporation ("Towers") and additional counterclaim-defendant Steven Hoffenberg appeal from so much of a final judgment of the United States District Court for the Southern District of New York, Leonard B. Sand, *Judge*, as (1) summarily dismissed Towers's complaint against defendant Cadillac Insurance Company ("Cadillac") for anticipatory breach of a loan commitment agreement, (2) ordered Towers to pay Cadillac $51,652.55 as costs and attorneys' fees incurred in connection with the defense of Towers's complaint, and (3) ordered Towers and Hoffenberg to pay Cadillac $97,893.96 as costs and attorneys' fees incurred in connection with Cadillac's first counterclaim. The court granted summary judgment dismissing the complaint on the ground that Towers had not fulfilled its own obligations under the loan commitment agreement; the court ruled in favor of Cadillac on its counterclaims for repayment of a note and for reimbursement of attorneys' fees provided for by contract. 708 F.Supp. 612. On appeal, Towers contends principally that summary judgment was improper because its timely performance of conditions imposed by the loan commitment agreement was not essential and because there were genuine issues as to whether Cadillac had waived performance of the pertinent conditions; Towers and Hoffenberg contend that the awards of attorneys' fees were not entirely authorized by the agreements at issue and that the amounts awarded were unreasonable. For the reasons below, we affirm the judgment.

## I. BACKGROUND

The material facts are not genuinely in dispute. In late 1987, Towers contracted to purchase a 111-foot yacht, the MARCO POLO, from a third party. In order to finance the purchase, Towers proposed to borrow $1.4 million from Cadillac.

### A. The Arrangements for the Loan

Towers and Cadillac entered into a loan commitment agreement reflected in a January 11, 1988 letter signed by both parties ("Commitment Letter" or "Loan Commitment"), pursuant to which Cadillac was to grant Towers a $1.4 million loan on which Hoffenberg, Towers's president, would be guarantor. The Commitment Letter provided, in part, (1) that "[n]ot less than thirty (30) days before the closing date," Towers would provide Cadillac with, *inter alia*, (a) "[a]n appraisal report (the "appraisal") prepared at the request of [Cadillac] for [Cadillac's] use, by a duly qualified marine appraiser, and satisfactory to [Cadillac]"; (b) an inspection report regarding the vessel's seaworthiness and general condition (the "survey"); (c) financial statements for Towers and any guarantors of the loan; and (d) such other documents and information as Cadillac might reasonably request; (2) that Towers would provide proof of its corporate existence, including a certified copy of its certificate of incorporation and bylaws, and an opinion letter from its counsel confirming, *inter alia*, that Towers would be legally bound by the various documents evidencing the loan when they were properly executed; and (3) that Towers was to pay Cadillac a 2% loan commitment fee, *i.e.*, $28,000, of which $5,000 was payable upon Towers's acceptance of the Commitment Letter and $23,000 was payable at the loan closing. The Commitment Letter provided that the loan

commitment would expire if the closing did not occur on or before March 15, 1988, and that "[w]hether or not the Loan is closed, all expenses of [Cadillac] in connection with the Loan, including ... the fees of [Cadillac's] attorneys, shall be paid by [Towers]."

In February 1988, Towers and Cadillac entered into an additional agreement ("Escrow Agreement"), pursuant to which Cadillac paid $1.4 million into an escrow account to be maintained by Towers's attorneys at a commercial bank. This agreement, which was set forth on the letterhead of Towers's attorneys, annexed and incorporated the Commitment Letter. In the Escrow Agreement, Cadillac "agree[d] that at such time as Towers satisfie[d] all of the terms and conditions of the Loan Commitment," Cadillac would instruct the escrow agent to release the escrowed funds to Towers; if Cadillac gave no such instructions on or before May 31, 1988, the escrow agent was required to return the funds, with all earned interest, to Cadillac. These provisions adjourned the loan closing deadline to May 31, 1988.

The Escrow Agreement also provided that any waivers or modifications of the parties' obligations were to be in writing:

9. Except as otherwise specifically provided for hereunder, no party to this Escrow Agreement shall be deemed to have waived any of its rights hereunder or under any other agreement, instrument or paper signed by any of them with respect to the subject matter hereof, unless such waiver is in writing and signed by the party waiving said right. Except as otherwise specifically provided for hereunder, no delay or omission by any party to this Escrow Agreement in exercising any right with respect to the subject matter hereof shall operate as a waiver of such right or of any such other right....

. . . .

12. This Escrow Agreement may not be changed, modified, extended, terminated, or discharged orally, but only by an agreement in writing, signed by all of the parties to this Escrow Agreement.

' On March 30, 1988, Cadillac authorized the escrow agent to advance to Towers $225,000 of the funds held in escrow. In exchange, Towers executed a promissory note (the "Note") for that amount plus interest, and it agreed to pay Cadillac the remaining $23,000 of the loan commitment fee, originally due at the closing, immediately. The Note provided that if the loan closing did not occur on or before May 31, "this Note, including all accrued interest and principal evidenced hereby, shall be immediately due and payable in full on May 31, 1988." The Note also provided that

[u]pon default in the payment of all or any portion of the principal and/or interest when due hereunder, [Towers] agrees to pay all costs of collection, including reasonable attorneys' fees, court costs, costs of appeal, and other costs incurred by [Cadillac] under such circumstances, in case the principal of the Note or any interest thereon is not paid at the Due Date hereunder, whether or not suit is commenced for such purpose.

By a Guaranty also dated March 30, 1988, Hoffenberg personally guaranteed Towers's performance of the terms and conditions of the Note, and he

agree[d] to indemnify [Cadillac] and hold it harmless from and against any and all reasonable losses, expenses and damages, including court costs, attorney's fees and disbursements, incurred by [Cadillac] in connection with the enforcement of its rights under this Guaranty, or as a result of the assertion of any and all claims for the return of moneys paid under the Note ....

B. *Performance of the Agreements*

In light of the new May 31, 1988 closing deadline, the appraisal, survey, financial statements, and other documents that the Commitment Letter required Towers to furnish were due not later than May 1. By May 5, however, Towers had not yet provided these materials, and Cadillac had attempted to make its own arrangements for an appraisal. On that date its attorneys wrote Towers's attorneys as follows:

As you know, we have requested David Pascoe of D.H. Pascoe & Co., Inc. perform an appraisal of the MARCO POLO pursuant to the terms of the Commitment Letter. Mr. Pascoe has been denied access to the vessel. Access is necessary to complete the appraisal. We understand, from our conversation of May 5, 1988, that you will do the necessary to obtain immediate access for Mr. Pascoe. Kindly contact this office as soon as possible with a date and time when Mr. Pascoe can inspect the vessel.

Towers's attorneys responded in a letter dated May 9, 1988, stating, *inter alia*, that an appraisal by Pascoe was unnecessary because Cadillac's attorneys had already approved Towers's own appraiser, one Patton, and that

> subject to the delivery to you of an appraisal letter and an opinion ... with respect to the ownership and title to the Marco Polo, all open items have been resolved and our client is in full compliance with its obligations pursuant to the commitment letter dated January 11, 1988 and is prepared to close this transaction upon delivery to you of such documents.

Cadillac's attorneys replied in a letter dated May 12, 1988, that (a) pointed out several respects in which Towers had not yet fulfilled its obligations, and (b) stated that they had not approved Patton as an *"appraiser"* but had only voiced no objection to his retention as a *"surveyor."* (Emphases in original.) The letter continued:

> In any event, we have not yet received a survey report, nor any report of any kind from Mr. Patton. As you know, pursuant to paragraph 1(e) the survey report was supposed to be delivered to Cadillac at least thirty days prior to the loan closing. Unless we are immediately provided with a complete survey/inspection report in form and substance satisfactory to Cadillac, ... Cadillac will proceed to retain its own surveyor to survey the vessel.

The May 12 letter also pointed out that the Commitment Letter required Towers to furnish "[n]ot less than thirty (30) days

before the closing date ... [a]n appraisal report *prepared at the request of Lender"* (emphasis in original), and that

> it was [Towers's] delay in providing an appraisal, after repeated promises, that prompted Cadillac to retain its own appraiser. Had Cadillac not proceeded to retain its own appraiser, we would have no assurance of receiving a satisfactory appraisal prior to the May 31 expiration of the escrow agreement.

The letter stated that there would be no closing until Cadillac had received the satisfactory appraisal to which it was entitled and until all of the other terms and conditions of the Commitment Letter had been met.

A further exchange of letters on May 25 reiterated each side's position. The May 31 deadline passed without Towers's having furnished a satisfactory appraisal or any of the other required documents. There was no closing, and on June 1, 1988, Cadillac demanded return of the escrowed funds. On May 26, however, Hoffenberg had instructed the escrow agent not to return the escrowed funds to Cadillac. The funds were not returned.

On June 9, Cadillac sent Towers a demand for payment of the Note. Payment was not forthcoming.

### C. *The Litigations and the Judgment Below*

On June 10, Towers commenced the present action in New York Supreme Court, alleging that Cadillac had anticipatorily breached the loan commitment agreement and seeking specific performance and damages. Cadillac promptly removed the action to federal court. In the meantime, the escrow agent filed an interpleader action in state court and deposited the escrow fund into that court. The interpleader action was stayed pending resolution of the present suit.

In the present action, Cadillac asserted two counterclaims against Towers. The first sought repayment of the Note and reimbursement for attorneys' fees in connection with collecting the Note; Cadillac successfully moved to add Hoffenberg as

an additional defendant on this counterclaim in his capacity as guarantor of the Note. The second counterclaim sought reimbursement for attorneys' fees in connection with the defense of Towers's complaint.

Cadillac moved for summary judgment dismissing the complaint and granting its counterclaims, contending that there were no genuine issues as to the terms of the pertinent agreements and the fact that Towers had not performed its contractual obligations. In opposition, Towers asserted, *inter alia*, that in December 1987, Hoffenberg and Cadillac had entered into an oral agreement for the loan, the terms of which had been impermissibly altered by the 1988 written agreements, and that in any event, Cadillac had waived performance of the written conditions.

In an opinion dated March 31, 1989 ("Opinion"), the district court granted Cadillac's motion for summary judgment, dismissing the complaint and awarding Cadillac judgment on the Note. The court rejected Towers's contention that Cadillac had orally waived the contractual conditions imposed on Towers, ruling that an oral waiver was not permitted in light of the parties' agreements and New York General Obligations Law § 15-301 (McKinney 1989). Finding on the basis of Hoffenberg's own affidavits that Towers had not furnished Cadillac with the required appraisal and had prevented Cadillac's own appraiser from gaining access to the boat, the court concluded that Cadillac had not breached the loan commitment agreement. The court also rejected Towers's argument that time was not of the essence and that thus Towers's failure to provide the materials called for by the Commitment Letter was excused.

Following a hearing with respect to Cadillac's request for attorneys' fees, the court concluded, in a Memorandum Endorsement dated May 8, 1989 ("Memorandum"), that Cadillac was entitled to recover the fees sought in each counterclaim. It found that the contractual fee provisions were sufficiently broad to cover the costs of seeking repayment of the Note, of defending Towers's meritless complaint, and of defending the state-court interpleader action.

Accordingly, judgment was entered (1) dismissing Towers's complaint; (2) requiring Towers and Hoffenberg, jointly and severally, to pay Cadillac (a) $225,000, plus interest, on the Note, and (b) costs and attorneys' fees of $97,893.96 in connection with collection of the Note; and (3) requiring Towers to pay Cadillac costs and attorneys' fees of $51,652.55 in connection with Towers's litigation of the loan commitment agreement.

This appeal followed. Appellants do not challenge the judgment insofar as it orders them to pay the Note and interest on it. They challenge only the dismissal of Towers's complaint and a portion of the awards of attorneys' fees.

## II. DISCUSSION

In seeking the reversal of so much of the judgment as dismissed its complaint, Towers argues that its failure to provide Cadillac with the required appraisal, survey, financial statements, and other documents was immaterial because performance of those conditions had been waived or because time was not of the essence under the agreements. Towers also contends that Cadillac anticipatorily breached the loan commitment agreement by retaining its own appraiser. In challenging the awards of attorneys' fees, Towers and Hoffenberg contend that no award was permissible with respect to Cadillac's defense against the complaint and against the state-court interpleader action and that, in any event, the amounts awarded were unreasonably high. We find no merit in any of these contentions.

### A. *The Dismissal of the Complaint*

#### 1. *Waiver*

Under New York law, which the parties agreed was to govern the loan commitment agreement, "[a] written agreement ... which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is

in writing and signed by the party against whom enforcement of the change is sought or by his agent." N.Y.Gen.Oblig.Law § 15–301(1) (McKinney 1989). In general, therefore, a written agreement that expressly states it can be modified only in writing cannot be modified orally.

■■ There are two exceptions to this principle. First, an oral modification may be enforced when there has been partial performance of the agreement to modify, so long as the partial performance is "unequivocally referable to the oral modification." *Rose v. Spa Realty Assocs.*, 42 N.Y.2d 338, 343, 397 N.Y.S.2d 922, 926, 366 N.E.2d 1279, 1283 (1977). If the conduct that allegedly constituted partial performance of the oral agreement to modify was in fact compatible with the original agreement, the oral agreement will not be enforced. Second, when one party has induced the other party to rely on an oral modification, the first party may be equitably estopped from invoking the requirement that any modification be in writing. Here, too, the conduct claimed to have been performed in reliance on the oral modification must be unequivocally referable to the modification: "Comparable to the requirement that partial performance be unequivocally referable to the oral modification, so, too, conduct relied upon to establish estoppel must not otherwise be compatible with the agreement as written." *Id.* at 344, 397 N.Y.S.2d at 927, 366 N.E.2d at 1283. Thus, for either exception to apply, the conduct claimed to have resulted from the oral modification must be conduct that is inconsistent with the agreement as written.

■ In the present case, the Escrow Agreement between Towers and Cadillac, which incorporated the terms of the Commitment Letter, stated expressly that there could be no modification orally and emphasized that a modification could occur "only by an agreement in writing, signed by all of the parties to this Escrow Agreement." It further stated that there could be no waiver by either party of any of its contract rights relating to the loan commitment "unless such waiver is in writing and signed by the party waiving said right."

Towers has produced no written modification or waiver with respect to any of the pertinent contractual conditions imposed on it. Thus, the oral modifications alleged by Towers are presumptively unenforceable.

■■ The district court properly rejected as a matter of law Towers's contention that the alleged oral modifications were enforceable because of Towers's partial performance or because Cadillac should be equitably estopped for having lulled Towers into believing that strict compliance with the contract terms was unnecessary. Though Towers claimed, for example, that its expenditures of more than $1 million to refurbish the MARCO POLO constituted partial performance in reliance on its understanding that Cadillac would not strictly enforce the written requirements, nothing in the written agreements precluded such expenditures. Nor is there merit in Towers's argument that the alleged oral modifications are enforceable because Cadillac acquiesced in postponing the original March 15 expiration date, granted Towers the $225,000 advance, and failed to object until mid-May to Towers's failure to comply with certain of the conditions of the loan. The delay of the closing deadline until May 31 was part of the written Escrow Agreement; it was in writing and signed by Cadillac. None of the other conduct attributed to Cadillac was inconsistent with its rights under the agreements as written.

In sum, as the district court noted, "[e]very example of conduct that Towers cites in support of its assertions of partial performance and equitable estoppel . . . is entirely consistent with the agreements as written . . . ." Opinion at 4. Towers pointed to no conduct that could have been considered unequivocally referable to the alleged modifications.

We conclude that the district court properly ruled that Towers's reliance on alleged oral modifications and waivers was foreclosed as a matter of law.

2. *Whether Time Was of the Essence*

■ The district court also properly rejected the contention that Towers's failures

to provide materials required by the Loan Commitment were excusable on the theory that time was not of the essence. Parenthetically, we doubt that it could rationally be assumed that time was not of the essence in an agreement requiring a commercial lender to place $1.4 million in an escrow account at a commercial bank, presumably at an interest rate below commercial banks' then-prime lending rate of 8½%, thereby precluding the lending of those funds at its normally significantly higher rates (*e.g.*, 10½% on the Towers loan), and costing the lender hundreds of dollars a day in interest.

■ In any event, New York law requires that contract provisions specifying dates for performance be strictly enforced in a contract action at law. In such an action, the parties are presumed to have agreed that time is of the essence unless there is contract language to the contrary. *See Sparks v. Stich*, 135 A.D.2d 989, 991, 522 N.Y.S.2d 707, 709 (3d Dep't 1987) (mem.); *Lusker v. Tannen*, 90 A.D.2d 118, 124, 456 N.Y.S.2d 354, 357 (1st Dep't 1982). While the converse is true in an action in equity, *see id.* at 124, 456 N.Y.S.2d at 357 (in equity, date normally not deemed to be of the essence "unless it affirmatively appears that the parties regarded it as a material consideration"), and Towers asked for specific performance of the loan commitment agreement, this was not properly an action in equity, for equitable relief would not have been appropriate. Specific performance is rarely granted where the subject of the contract is not real property. "The rule is that, as to contracts pertaining to personal property, a party should be confined to his action for damages, unless it appears that he is entitled to the thing contracted for in specie, which to him has some special value, or in cases where it is apparent that compensation in damages would not furnish a complete and adequate remedy." *Id.* Money damages are the norm in actions involving personal property because personal property is relatively fungible.

The loan commitment agreement required Cadillac merely to provide Towers with money, and money is the quintessential fungible. Thus, even if Cadillac had breached the agreement, Towers would be entitled only to money damages reflecting the difference between the interest rate it had agreed to with Cadillac and such higher interest rate as it was reasonably forced to pay another lender as a result of Cadillac's breach. We see no basis for treating this action as anything other than the usual action at law for contract damages.

Accordingly, the court properly enforced the deadlines provided in the parties' written agreements.

### 3. *Anticipatory Breach*

■ Finally, the district court properly summarily dismissed Towers's contention that, in refusing to accept an appraisal report from Towers and hiring its own appraiser, Cadillac anticipatorily breached the loan commitment agreement. A plaintiff may recover for anticipatory breach if it can show (1) that the defendant "insist[ed] upon terms which are not contained in a contract," *REA Express, Inc. v. Interway Corp.*, 538 F.2d 953, 955 (2d Cir.1976) (applying New York law), and (2) that the plaintiff was ready, willing, and able to perform its own obligations under the contract when performance was due, *see Huntington Mining Holdings, Inc. v. Cottontail Plaza, Inc.*, 60 N.Y.2d 997, 997, 471 N.Y.S.2d 267, 267, 459 N.E.2d 492, 492 (1983) (mem.). Towers made no showing that it could satisfy either of these conditions.

Though Towers argues that Cadillac could not properly engage its own appraiser and was instead required simply, if dissatisfied with a report provided by Towers, to ask Towers to provide a new report, this argument was correctly rejected in light of both the undisputed events and the plain terms of the agreement. The Commitment Letter required that, not less than 30 days before the closing, Cadillac "shall be furnished with ... [a]n appraisal report prepared at the request of [Cadillac] for [Cadillac's] use, by a duly qualified marine appraiser, and satisfactory to [Cadillac]." With a closing deadline of May 31, Towers

had failed to provide a satisfactory report by May 1, or May 5, or May 12. Cadillac gave Towers an opportunity to provide a satisfactory appraisal report even after the May 1 deadline had passed. Towers did not do so. Nothing in the Commitment Letter prohibited Cadillac from obtaining its own appraisal report. Cadillac was well within its contractual rights, especially in light of Towers's recalcitrance, to seek its own appraisal. Cadillac's actions plainly did not constitute an anticipatory breach.

Further, even if Towers had shown that Cadillac exceeded its rights by hiring its own appraiser, Towers made no showing that it could present evidence of its readiness and ability to perform its own contractual obligations. In the absence of such a showing, Towers could not defeat summary dismissal of its claim for anticipatory breach.

In sum, Towers failed to raise any genuine issue material to the requirements of the loan commitment agreement and the fact of its own nonperformance. Accordingly, we affirm the dismissal of Towers's complaint.

## B. The Awards of Attorneys' Fees

With respect to the district court's award to Cadillac of attorneys' fees, Towers and Hoffenberg apparently do not contest so much of the judgment as requires them to reimburse Cadillac for the expense of collecting on the Note. Rather, they contend that ordering them to pay the expenses incurred by Cadillac in defending against Towers's complaint and against the state-court interpleader action was improper. They also argue that the amounts awarded were unreasonably high. We find no merit in either contention.

In passing, we note that, though the Loan Commitment is governed by New York law, the Guaranty, under which Hoffenberg is jointly and severally liable for Cadillac's costs of collecting the Note, is governed by Michigan law. The controlling principles appear to be the same under both.

## 1. Authority for the Award

In challenging the award of fees for defending against the complaint and against the interpleader action, Towers and Hoffenberg argue principally that such an award is impermissible under this Court's decision in Jackson v. Oppenheim, 533 F.2d 826 (2d Cir.1976). We disagree with the contention that that decision controls this case.

In Jackson v. Oppenheim, Jackson had purchased securities from Oppenheim and had signed two notes, each of which stated that "[i]f this note is placed with an attorney for collection the maker shall pay all costs of collection, including, but not limited to, counsel fees." Id. at 830. Thereafter, Jackson unsuccessfully sued Oppenheim for fraud under the federal securities laws, and Oppenheim successfully counterclaimed to collect on the notes. In connection with the successful counterclaims, the district court awarded Oppenheim not only the cost of collecting on the promissory notes but also the cost of defending against Jackson's securities law claim. We reversed, ruling that "language more express than 'costs of collection' should have been employed to have placed [Jackson] on notice that he was undertaking to protect [Oppenheim] from costs incurred in defending a separate claim regarding validity of the underlying sale transaction under the federal securities laws." Id. at 831. Cf. Redfern v. R.E. Dailey & Co., 146 Mich. App. 8, 379 N.W.2d 451, 456 (1985) (indemnity agreement covering "all claims, liabilities, losses, damages and expenses of every character whatsoever" broad enough to include attorneys' fees, while agreement covering "any and all claims and demands of whatever nature" not broad enough).

Jackson is doubly distinguishable from the present case. First, the securities law claim in Jackson was not a contract claim but rather was a collateral attack on the contract. Here, in contrast, Towers's action raised issues only as to the terms and performance of the loan commitment agreement; the interpleader action likewise depends only on the resolution of issues integral to the performance of the loan

commitment agreement. Arguably even a contract provision as limited as "costs of collection" would cover the expense incurred by Cadillac to recover the escrowed funds and the sum loaned in exchange for the Note where the only challenges to its right to recover are integral to the agreement rather than collateral. Further, the fact that Towers commenced suit first would not remove Cadillac's cost of defending that action from the category of "costs of collection"; Towers cannot avoid its contractual responsibilities simply by making a meritless preemptive strike.

Second, in the present case, the contract language was substantially broader than the language at issue in *Jackson*. In each pertinent document, the language was ample to place Towers or Hoffenberg on notice that it or he was agreeing to reimburse Cadillac for costs and attorneys' fees incurred in defending an action for specific performance of the loan commitment agreement and in pursuing any litigation needed to recover funds placed in escrow in connection with that agreement. Each of the documents specifically included attorneys' fees in the costs and expenses to be reimbursed, and each was open-ended with respect to costs and fees relating to the underlying agreements. Thus, the Commitment Letter stated that whether or not the Loan was closed, Towers would pay "all expenses of [Cadillac] in connection with the Loan." The Note stated that "[u]pon default," Towers would pay not just the costs of collection, but also "other costs incurred by [Cadillac] under such circumstances, in case the principal of the Note or any interest thereon is not paid at the Due Date hereunder, whether or not suit is commenced for such purpose." The Guaranty stated that Hoffenberg agreed to indemnify Cadillac against "any and all reasonable ... expenses ... incurred by [Cadillac] in connection with the enforcement of its rights under this Guaranty, or as a result of the assertion of any and all claims for the return of moneys paid under the Note." In all three documents, the language was substantially broader than the "costs of collection" language at issue in *Jackson*.

The district court did not err in determining that these provisions authorized Cadillac's recovery of fees. It is plain that the expense of defending against an action for alleged breach of the loan agreement and the expense of showing that Cadillac was entitled to the escrowed funds in the interpleader action, were, within the meaning of the Commitment Letter, expenses incurred "in connection with the Loan." Equally plainly, there was a default under the terms of the Note, and since Towers interposed virtually its entire complaint as an affirmative defense to Cadillac's counterclaim for repayment of the Note, Cadillac was required, in the "circumstances" adverted to by the Note and "in connection with the enforcement of its rights under th[e] Guaranty," to litigate Towers's complaint in order to collect the Note. In sum, Cadillac was required to defend each action in order to establish its right to recover its $1.4 million. It was entitled, under the terms of the agreements, to an appropriate award for each category of expenses.

### 2. *The Amounts Awarded*

The only remaining issue is whether, as Towers contends, the amounts awarded were unreasonable because they required payment for time expenditures that were unwarranted. In reviewing such a contention, we will not reverse unless the district court has abused its discretion. *See, e.g., Brandeis School v. NLRB*, 871 F.2d 5, 6 (2d Cir.1989); *Wood v. Detroit Auto Inter-Ins. Exch.*, 413 Mich. 573, 321 N.W.2d 653, 661 (1982). We see no abuse of discretion here.

The district court had before it detailed, contemporaneous records of the time spent by Cadillac's attorneys. And though it did not make extensive findings, the court plainly considered Towers's contention that the hours were inflated and rejected that contention after evaluation of the billings in light of the course of the litigation. The court found that "some of the time charges that Towers now terms excessive were the result of Cadillac's having to answer baseless allegations"; these allegations included Towers's assertion that Towers and Cad-

illac never entered into a loan commitment agreement in January 1988. Memorandum at 3. On the basis of this record, the district court's finding was not erroneous, and we cannot say that the amount of attorneys' fees awarded constituted an abuse of discretion.

## CONCLUSION

We have considered all of appellants' arguments on this appeal and find them to be without merit. The judgment of the district court is affirmed.