# United States Court of Appeals

## For the First Circuit

No. 14-1276

IN RE: ACCESS CARDIOSYSTEMS, INC.

Debtor

RANDALL FINCKE,

Appellant,

v.

ACCESS CARDIOSYSTEMS, INC.; JOHN J. MORIARTY; RICHARD F. CONNOLLY, JR.; JOSEPH R. ZIMMEL; NORTH AMERICAN ENTERPRISES, INC.; JOHN MORIARTY AND ASSOCIATES,

Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Lynch, Chief Judge,
Howard and Barron, Circuit Judges.

John J.E. Markham, II, with whom Markham & Read was on brief, for appellant.
Barry C. Klickstein, with whom Sara A. Colb and Day Pitney LLP were on brief, for appellees.

January 13, 2015

**LYNCH, Chief Judge**.   This appeal concerns the construction and application of a section of the Massachusetts Uniform Securities Act, Mass. Gen. Laws ch. 110A, § 410(a)(2), both as to the materiality of a misrepresentation and as to when an offer or sale has been made "by means of" such a misrepresentation. There is surprisingly little case law interpreting the statute's phrase "by means of."  We are mindful that this provision is to be "construed as to . . . make uniform" state securities laws and "to coordinate the interpretation and administration of this chapter with the related federal regulation."  Id. § 415.

Access Cardiosystems, Inc. ("Access") was a small start-up company, a purveyor of portable automated external heart defibrillators ("AED").  Despite investments from four investors of over $20 million from 2001 to 2005, the company struggled and eventually filed for Chapter 11 bankruptcy protection in 2005.  The founder, director, and officer of Access was Randall Fincke.

Four investors, in a third amended complaint filed on April 5, 2007, alleged that Fincke had violated Mass. Gen. Laws ch. 110A, § 410(a)(2), and had committed fraud, negligent misrepresentations, and numerous breaches of fiduciary duty.  The bankruptcy court heard many witnesses over the course of successive trials on liability and then on damages.  The bankruptcy court found as a matter of fact that (i) Fincke had made a false statement of material fact to investors in violation of the

Massachusetts blue sky law, Mass Gen. Laws ch. 110A, § 410(a)(2), and (ii) that one such investor, Joseph Zimmel, was entitled to damages, totaling $1.5 million, for his investments that Fincke solicited "by means of" that material misstatement.  Access Cardiosystems, Inc. v. Fincke (In re Access Cardiosystems, Inc.), 404 B.R. 593, 698-99 (Bankr. D. Mass. 2009) (hereinafter Access II) (liability); Access Cardiosystems, Inc. v. Fincke (In re Access Cardiosystems, Inc.), 460 B.R. 67, 83 (Bankr. D. Mass. 2011) (hereinafter Access IV) (damages).[1]  These findings were affirmed on appeal to the district court.  See Fincke v. Access Cardiosystems, Inc. (In re Access Cardiosystems, Inc.), 488 B.R. 1, 7-10 (D. Mass. 2012).

Fincke has appealed those two findings to us.  We affirm. The extensive background and facts of the case are stated in both the bankruptcy and the district court opinions.  No purpose would be served by repetition here.

I.

The leading Massachusetts case on Mass. Gen. Laws ch. 110A, § 410(a)(2) is Marram v. Kobrick Offshore Fund, Ltd., 809 N.E.2d 1017 (Mass. 2004).  Like its federal counterpart, the Securities Act of 1933, 15 U.S.C. §§ 77a et seq., the state statute

---

[1] This "interminable case" has numerous chapters, not all relevant here; we follow the district court's numbering of these bankruptcy decisions.  See Fincke v. Access Cardiosystems, Inc. (In re Access Cardiosystems, Inc.), 488 B.R. 1, 3, 5-6 (D. Mass. 2012) (listing case history).

"creates criminal and civil liability for securities-related infractions." Marram, 809 N.E.2d at 1025. In turn, § 410(a)(2) specifically creates civil liability for sales of securities "by means of fraud or misrepresentation." Id. (citation and internal quotation marks omitted). Both oral and written material misrepresentations are actionable. Id. at 1026. The state law is very consumer-oriented, and does not require the plaintiff to show that the defendant knew that the statement or omission was false or misleading. Id. Instead, the defendant is held to an "inverse negligence standard":

> While not imposing strict liability on the seller for untrue statements or omissions, [the state law] holds the seller to the heavy burden of proof "that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission."

Id. (quoting Mass. Gen. Laws ch. 110A, § 410(a)(2)) (citing 12A J.C. Long, Blue Sky Law § 9:23 (2003)) (describing a statutory defense). The law limits relief to returning the buyer to the status quo through recission, or if recission is unavailable, to equivalent damages. Marram, 809 N.E.2d at 1025 n.16, 1028. Contract damages are not available, nor are punitive damages. Id. at 1028.

The bankruptcy court thoroughly examined the context in which the misrepresentation was made. It found that Fincke's faltering start-up company, Access, needed substantial cash infusions in 2002 to pay vendor accounts and buy necessary raw

-4-

materials.  Accordingly, Fincke and others prepared a business plan in October 2002 ("October 2002 Business Plan") to solicit further investments and additional investors.  They sent the October 2002 Business Plan to each of the three extant investors, as well as to Joseph Zimmel, a new, potential investor.  The Plan contained this statement:

> Access has been advised by its patent counsel
> that its product does not infringe any patents
> known to him.

The bankruptcy court found that this was a misrepresentation: patent counsel never offered any opinion, formal or informal, on this matter, and Fincke knew or should have known of the falsity of the statement.  Access II, 404 B.R. at 614-15, 666; Access IV, 460 B.R. at 70-71, 75-76.

Fincke's first argument on appeal is that the bankruptcy court erred in so finding falsity.  He argues that the court erred by "converting" the statement "from a statement that Fincke had been advised that there were no patent infringements, to the assertion, never made, that Fincke had received a formal legal opinion."  He also argues that the bankruptcy court failed to appreciate the context of the statement, which he claims went to great lengths to warn investors that the advice could not be relied upon.[2]

_____

[2] The paragraph containing this statement appears in Section Eleven, "Risk Factors," of the October 2002 Business Plan.  That paragraph reads in full (emphasis added):

Both arguments fail. The bankruptcy court's finding that patent counsel never offered any opinion, formal or informal, is fully supported by the record. At most, Fincke had "discussed" the claims from the Philips letter with patent counsel, and "related [Fincke's] personal conclusion that the [device] did not infringe." Access II, 404 B.R. at 666. We agree with the bankruptcy court's conclusion that this is a "far cry from receiving 'advice.'" Id. And Fincke's attempt to distinguish between "advice" and "formal opinion" is particularly frivolous given that the sentence immediately following the Plan's misstatement expressly refers to "that opinion."

The bankruptcy court also correctly concluded that the warnings could not "cure the obvious falsity of this clear representation of fact." Access II, 404 B.R. at 666. Those

---

Many U.S. and foreign patents have been issued to Access's competitors with respect to AED's and their constituent components. Access has been advised by its patent counsel that its product does not infringe any patents known to him. However, there can be no assurance that that opinion is correct in all respects.

The Business Plan also made plain that others disagreed that the AED did not infringe any known patents by disclosing that Access had already been sued for patent infringement (emphasis added):

Access is a defendant in a patent infringement claim brought by Cardiac Sciences, Inc. Access believes that it has a complete defense to the infringement claim. However, there can be no assurance that the Court hearing the matter will agree with Access. The cost of litigation may have a material adverse impact on Access, even if Access prevails.

warnings, that "there can be no assurance that [the] opinion is correct in all respects" or that others disagreed as evidenced by pending litigation, merely suggest that the supposed advice was not dispositive. But Massachusetts law does not permit a seller to defeat his statutory obligation of truthfulness by suggesting that a nonexistent opinion should not be relied upon, or by hedging his misrepresentation. Cf. Marram, 809 N.E.2d at 1028 ("[T]o permit the seller of securities to discharge, or to defeat, his statutory obligation of truthfulness to the buyer merely by attaching an integration clause to a subscription agreement would enfeeble the statute.").

## II.

Fincke's next argument on appeal appears to be that it was somehow inconsistent for the court to find this particular misstatement was material to investors. Fincke argues that the bankruptcy court found the numerous other statements he made were not misrepresentations and that the court disbelieved many of the investors' assertions of reliance at the damages trial.

There is no inconsistency. The standard for materiality is "objective," only requiring a "substantial likelihood" that the (hypothetical) reasonable investor would find that the misrepresentation "significantly altered the 'total mix' of information made available." See Marram, 809 N.E.2d at 1030 (quoting Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628, 641 (3d

Cir. 1989)).  It does not require that the particular investor in question actually so relied.  Id. at 1026-27 ("[B]ecause . . . § 410(a)(2) . . . holds the seller liable for inaccurate disclosure or nondisclosure of material information, foremost among the elements that the buyer does not have to prove is reliance." (citation and internal quotation marks omitted)).

As the bankruptcy court found, affirmatively representing that patent counsel "has reviewed and preliminarily passed muster on the patent soundness of the intellectual property" significantly alters the total mix of information about the proposed investment's risk.  Access II, 404 B.R. at 666; see Access IV, 460 B.R. at 76. Fincke's argument as to materiality falls far short of meeting the clear error standard; the bankruptcy court made no mistake. Palmacci v. Umpierrez, 121 F.3d 781, 785 (1st Cir. 1997) (noting that finding clear error requires a "definite and firm conviction that a mistake has been committed" (citation and internal quotation marks omitted)).

III.

Finally, Fincke challenges the court's finding as to damages.[3]  Here, the bankruptcy court held that only one investor,

_____

    [3]    The bankruptcy court ruled that rescission was no longer available as a remedy because the investors no longer owned the securities under the confirmed Chapter 11 plan, but found they were entitled to damages calculated as the amount that would be recoverable upon a tender. Access Cardiosystems, Inc. v. Fincke (In re Access Cardiosystems, Inc.), 438 B.R. 16, 23 (Bankr. D. Mass. 2010) (hereinafter Access III).  Fincke does not contest

Zimmel, was entitled to damages for investments solicited "by means of" the material misstatement, and, even then, as to only some of his investments. See Access IV, 460 B.R. at 82-83. The bankruptcy court found that Zimmel and the other investors' remaining investments, though made after the material misstatement, had not been solicited by means of that misstatement. Id. All parties appealed to the district court, which affirmed. Access Cardiosystems, 488 B.R. at 9-10.

Only Fincke presses his appeal. He claims that he does not dispute the court's finding that the language of § 410(a)(2) limits liability to instances where securities were sold "'by means of' [a] material misstatement," or that reliance need not be shown. Rather, he argues that the court's reasoning is insufficient to meet the "by means of" requirement because it is based solely on the timing of the investor's receipt of the misrepresentation and the dates of the actual investments made, and not, he says, on the role the misstatement actually played in Zimmel's decision to invest. But the alternative standard he appears to suggest for determining the role played, and so for determining if the "by means of" requirement has been met, comes too dangerously close to a reliance or loss-causation requirement.

---

this. Cf. Mass. Gen. Laws ch. 110A, § 410(a)(2) (providing for damages).

There is little discussion of the "by means of" requirement under § 410(a)(2) in the case law, including in Massachusetts, in part because the issue rarely arises. See 12A J.C. Long, Blue Sky Law §§ 9:117.44-45 (2014) (explaining "[i]t should be obvious that virtually all" § 410(a)(2) cases satisfy the requirement "if the misrepresentations are made before the sale"). We turn for guidance to the related federal legislation, and in particular to "Federal decisions under § 12(2), as well as to the plain language of the statute." Marram, 809 N.E.2d at 1025 (noting that Mass. Gen. Laws § 410(a)(2) "is almost identical with § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l[(a)](2)" (citations and internal quotation marks omitted)).[4]

---

[4] The relevant provision reads:

(a) In general[.] Any person who . . .

    (2) offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraphs (2) and (14) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,

shall be liable, subject to subsection (b) of this

Several federal courts have held that the "by means of" language in § 12(2) of the federal statute requires "some causal connection between the misleading representation or omission and [the] plaintiff's purchase."  Sanders v. John Nuveen & Co., 619 F.2d 1222, 1225 (7th Cir. 1980); see also Jackson v. Oppenheim, 533 F.2d 826, 830 & n.8 (2d Cir. 1976).  Although the characterization of this connection as "causal" raises clarity problems, the cases themselves are instructive.  Cf. Sanders, 619 F.2d at 1225 (explaining that it is "well settled" that "by means of" does not create a reliance requirement).  Sanders found that the requirement was satisfied by the use of a misleading prospectus to sell "securities of which those purchased by the plaintiff were a part," even though the plaintiff never received the report.  Id. at 1225-27.  Conversely, Jackson held that the requirement was not met where the allegedly misleading omissions occurred during a conversation at which it was "undisputed that no sale was

> section, to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

15 U.S.C. § 77l(a)(2).  There is an important difference between the two causes of action, however: the federal cause of action does require loss causation, as expressly provided for in a separate provision not relevant here.  Compare 15 U.S.C. § 77l(b) (providing lack of loss causation as an affirmative defense), with Mass. Gen. Laws ch. 110A, § 410(a)(2) (providing no such limitation on or defense to liability).

-11-

contemplated or discussed," such that "the evidence [was] clear that the challenged communication was <u>neither intended nor perceived</u> as instrumental in effecting the sale." <u>Jackson</u>, 533 F.2d at 829-30 (emphasis added).

We find this "use" approach persuasive. Given that a central purpose of the statute is to provide a "heightened deterrent" against the use of misrepresentations in selling securities, <u>Marram</u>, 809 N.E.2d at 1025 (citation and internal quotation marks omitted), we find that the requisite connection is established when the communication containing the material misrepresentation was <u>used</u> to effect the sale -- and not whether it was actually successful in securing the sale that, in any event, transpired. <u>See</u> <u>Jackson</u>, 533 F.2d at 830 n.8.[5] This is an

_____

[5] The Second Circuit's language exhibits the same tension identified above. First, the court states that while "the statement that 'reliance' need not be proven by plaintiffs in 12(2) actions has been broadly read by several courts[,] [t]heir purport is that a plaintiff need not prove that the challenged communication had a 'decisive effect' in his decision to buy the stock." <u>Jackson</u>, 533 F.2d at 830 n.8 (collecting cases) (citations omitted). That is, the court explains, "[w]here liability is not based on an offer containing a misleading communication, but is based on a sale, Section 12(2) requires there to be <u>some causal relationship</u> between the challenged communication and the sale, even if not 'decisive.'" <u>Id.</u> (emphasis added) (citations omitted). Then, second, the court summarizes its reasoning: "In short, the communication must have been <u>intended or perceived</u> as instrumental in effecting the sale." <u>Id.</u> (emphasis added).
These are two distinct standards. "Intending" there to be some causal relationship does not entail that there will actually "be" some causal relationship. We adopt the "<u>intended or perceived</u> as instrumental" standard, to the extent that what the Second Circuit meant by this is that "the communication must have been <u>used</u>." (Despite talk of intentionality, we adopt an objective

-12-

objective standard, readily met.  This gives content to the phrase "by means of" that is consistent with the plain language of the statute, and follows the federal decisions to which we are directed by Marram.

Accordingly, the bankruptcy court committed no error in looking to objective evidence of whether Fincke had used the October 2002 Business Plan to solicit particular investments. Access IV, 460 B.R. at 82.  Contrary to what Fincke argues, the court did not merely rely on the timing of the investments relative to the plan, but looked to objective evidence of whether Fincke had used the October 2002 Business Plan to solicit particular investments.[6]  See id.  This is an objective test.  The court found that Fincke provided Zimmel with the October 2002 Business Plan when Fincke met with Zimmel in October to discuss Zimmel's becoming a new investor in Access.  Access II, 404 B.R. at 615. Zimmel had not purchased Access shares earlier and was not part of the original investor group.  Id.  Zimmel then purchased $1 million in Access shares later that month on October 30 and another

---

standard that determines use without reference to the seller's actual state of mind.)

[6]  We need not decide whether a mere timing connection is sufficient.  It would, however, be consistent with the Supreme Court's construction of a related provision in the federal law, Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j. See SEC v. Zandford, 535 U.S. 813, 820-25 (2002) (defining "in connection with" in terms of the misrepresentation and investment "coincid[ing]").

-13-

$500,000 in shares in November.  Id.; Access IV, 460 B.R. at 82-83. These facts, the court correctly concluded, were sufficient to show that Fincke had solicited Zimmel's October and November investments "by means of" the October 2002 Business Plan.  Access IV, 460 B.R. at 83 ("[B]ecause Zimmel need not demonstrate actual reliance on the misstatement, the use of the Business Plan to solicit that sale of stock allows Zimmel to recover damages under § 410(a)(2) for that particular transaction." (emphasis added)).

That the bankruptcy court discounted Zimmel's testimony that he had read the plan and relied on it as to his investments, id. at 78-79, 82, does not undermine the conclusion that Fincke used the plan to secure the investments.  Reliance may be an easy or obvious way to demonstrate that a sale was "by means of" the relied upon misrepresentation, but it is not necessary.  In context, the seller's actions alone may also show that a subsequent sale was "by means of" the misrepresentation.  Cf. Marram, 809 N.E.2d at 1025 ("Section 410(a)(2) provide[s] a heightened deterrent against sellers who make misrepresentations by rendering tainted transactions voidable at the option of the defrauded purchaser, regardless of the actual cause of the investor's loss." (citations and internal quotation marks omitted) (alteration in original)).

Our interpretation is supported by the statutory limitation on defenses.  Mass. Gen. Laws ch. 110A, § 410(a)(2),

provides only "two affirmative defenses in addition to a direct attack on one of the prima facie elements of a § 410(a)(2) claim": (i) that the plaintiff "actually knows that a representation is false or knows that existing information has been withheld," and (ii) that the defendant "did not know, and in the exercise of reasonable care could not have known, of the untruth or omission." Id. at 1027-28 (citations and internal quotation marks omitted). The second keeps the emphasis squarely on the seller's actions; the first prevents buyers from intentionally exploiting misrepresentations to insure their investments.

Affirmed.